LAW OFFICES OF
# DRATEL & LEWIS

**29 BROADWAY**
Suite 1412
NEW YORK, NEW YORK  10006

TELEPHONE (212) 732 0707
FACSIMILE (212) 571 3792
E MAIL: jdratel@dratellewis.com

JOSHUA L. DRATEL
LINDSAY A. LEWIS

May 18, 2020

**BY ELECTRONIC MAIL**

███████████████████████

The Honorable Cathy Seibel
United States District Judge
Southern District of New York
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

Re:     *United States v. Matthew Madonna*,
S3 17 Cr. 89 (CS)

Dear Judge Seibel:

This letter constitutes the sentencing submission on behalf of defendant Matthew Madonna, whom Andrew G. Patel, Esq., and I represent in the above-entitled case.  For the reasons set forth below, it is respectfully submitted that the Court should impose a sentence that does not include extensive additional imprisonment.  Also, this letter enumerates Mr. Madonna's objections, corrections, and additions to the Pre-Sentence Report ("PSR") prepared in this case.  This letter is filed under seal because it includes ███████████████████████████████ ██████████████████

Also, counsel also respectfully request that, in light of the current novel coronavirus ("COVID-19") pandemic, ███████████████████████████████████████████ ██████████████████ has impaired counsel's ability to meet and confer with Mr. Madonna, ███████████████████████████████ counsel be permitted to enlarge and supplement this submission once it is medically safe for Mr. Madonna to meet with his counsel ███████████████████████████████████████████████████.

---

[1]  A redacted version of this letter will be filed on the public docket promptly.

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 2 of 29

As detailed below, the reasons for a sentence for Mr. Madonna that does not include extensive additional imprisonment are as follows:

(1)     Mr. Madonna's advanced age ███████████████████████████ ██████████████████████ would render any extended imprisonment for Mr. Madonna unnecessary, and cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution. ███████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████

(2)     the mandatory sentence for Count Three (Murder in Aid of Racketeering Activity) life imprisonment without parole, pursuant to 18 U.S.C. §1959(a)(1) (*see also* PSR, at ¶ 101) is unconstitutional as applied to Mr. Madonna because, in light of his age ███████████████████████████████████████████ it would constitute cruel and unusual punishment in violation of the Eighth Amendment;

(3)     the evidence at trial, as well as other information produced by the government, establishes that Mr. Madonna, who has been imprisoned since 2015, no longer holds any position of authority or otherwise in the charged enterprise (or any other), and therefore, in conjunction with his age and condition, does not present a meaningful risk of recidivism;

(4)     Mr. Madonna served a five-year prison term for New York State and New Jersey convictions pursuant to his guilty pleas to offense conduct fully incorporated in the Indictment in this case and the evidence at trial, and which should be factored into his sentence herein because the expiration of those sentences during the course of this case precludes the Bureau of Prisons from affording him credit for that imprisonment;

(5)     ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

(6)     the harsh conditions of pretrial confinement Mr. Madonna endured for

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 3 of 29

approximately 20 months at the Metropolitan Detention Center in Brooklyn ("MDC"), which in other cases have constituted a basis for either downward departure or relief via the sentencing factors in 18 U.S.C. §3553(a), and which included a particularly harrowing one-week blackout at the facility in January-February 2019, warrant a reduced sentence;  and

(7)     in addition, as noted above and detailed below, his confinement in prison during the COVID-19 pandemic left him vulnerable to the virus, █████████████

As discussed below, in applying to Mr. Madonna both the mandate in §3553(a) that a sentence be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in" §3553(a)(2), and the sentencing factors set forth in §3553(a)(1)-(7), when these prescribed statutory criteria are considered independently or in combination, it is respectfully submitted that a sentence significantly below the applicable advisory Guidelines range, and which does not involve extensive additional imprisonment, is reasonable and achieves those statutory sentencing objectives.

It is also respectfully requested that the Court recommend that Mr. Madonna be designated to serve any sentence of imprisonment in a Bureau of Prisons Federal Medical Center (FMC).

I.      ***Mr. Madonna's Age*** ███████████████████ ***Render a Sentence of Extended Imprisonment Cruel and Unusual Punishment In Violation of the Eighth Amendment***

A.      ████████████████████████

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 4 of 29



LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 5 of 29



**B.**

**LAW OFFICES OF**

**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 6 of 29



LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 7 of 29



LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 8 of 29



**C.**   *Mr. Madonna's Age* ███████████████ *Would*
*Make Any Sentence of Incarceration More Onerous for Him*

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 9 of 29



LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 10 of 29



For instance, to alleviate the adverse impact of inevitably sub-par medical care in prisons, courts have granted downward departures based on the severity of anticipated post-sentence conditions of incarceration. *See, e.g., United States v. Bruder (Schwarz)*, 103 F. Supp.2d 155 (E.D.N.Y. 2000); *United States v. Volpe*, 79 F. Supp.2d 76 (E.D.N.Y. 1999). *See also United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994) (remanded to permit District Court to depart downward because defendant's status as deportable alien increased severity of confinement); *United States v. Lara*, 905 F2d 599 (2d Cir. 1990) (affirming downward departure due to more restrictive confinement as a result of defendant's physical vulnerability).

Here, the conditions of confinement Mr. Madonna would endure if sentenced to a term of imprisonment   and in particular a lengthy one   would constitute more punishment than ordinary defendants suffer in ordinary cases, and therefore qualify as an important factor at sentencing.

### D.     *The Data from the Sentencing Commission Establish That Recidivism Is Quite Unlikely for Someone Mr. Madonna's Age*

In addition, defendants older than 40 years of age present a dramatically reduced danger of recidivism.  Mr. Madonna is 84 years old, which effectively minimizes   if not eliminates   the need for any specific deterrence ▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬ *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 ("[r]ecidivism rates decline relatively consistently as age increases," from 35.5% for those under age 21 to 9.5% for those over age 50) (available at bit.ly/2WpO932). *See also United States v. Nellum*, 2005 WL 300073, at *3 (N.D. Ind. 2005);  Daniel Glaser, *Effectiveness of A Prison and Parole System*, 36-37 (1964);  P.B. Hoffman & J.L. Beck, "Burnout   age at release from prison and recidivism," 12 J.Crim.Just. 617 (1984).

According to the Sentencing Commission ("USSC"), only 3.1% of all federal offenders were over 60 years old in 2019. *See* USSC, *2019 Sourcebook*, available at bit.ly/2Z6js4d, at 50. Although the *2019 Sourcebook* does not further categorize ages above 60, Mr. Madonna is likely older than many of the offenders in this category, and is accordingly even less likely to commit crimes upon his release.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 11 of 29

Similarly, the USSC's report, "The Effects of Aging on Recidivism Among Federal Offenders," establishes that

> [o]lder offenders were substantially less likely than younger offenders to recidivate following release. Over an eight-year follow-up period, 13.4 percent of offenders age 65 or older at the time of release were rearrested compared to 67.6 percent of offenders younger than age 21 at the time of release.

U.S.S.C., "The Effects of Aging on Recidivism Among Federal Offenders," December 2017, available at bit.ly/391akz6, at 3.[4]

Thus, for all the reasons set forth above, █████████████████████████ and the Sentencing Commission's data and analysis, as well as those factors discussed below in POINT IV, Mr. Madonna does not present a risk of recidivism.

**II.**    ***A Sentence of Mandatory Life Imprisonment Without Parole for Mr. Madonna Would Be Unconstitutional As Applied to Him Because It Would Constitute Cruel and Unusual Punishment In Violation of the Eighth Amendment***

The jury's finding on Count Three would appear to require, pursuant to §1959(a)(1), that the Court impose a life sentence on an 84-year old man ███████████████████████

However, the Eight Amendment prohibits the infliction of "cruel and unusual

---

[4]  Nor, according to "the best available evidence[,]" does imprisonment generally "reduce recidivism more than noncustodial sanctions."  Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).  *See also* Gary Kleck, et al, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005); Michael Tonry, *The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings*, 38 Crime and Justice:  A Review of Research 102 (2009).  In fact, the USSC's report on recidivism concluded that "among all offenders sentenced to one year or more of imprisonment, there was no clear association between the length of sentence and the rearrest rate."  USSC, "The Effects of Aging on Recidivism Among Federal Offenders," at 3.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 12 of 29

punishments." U.S. Const. amend. VIII.  The Supreme Court has historically applied the prohibition of Cruel and Unusual Punishments narrowly, but recent developments in Supreme Court jurisprudence, statutes, state and federal legislation, and administrative reform, make it clear that the life sentences required by §1959(a)(1) are wholly inconsistent with the Eighth Amendment's proscription on cruel and unusual punishments.

The Eighth Amendment requires that sentences be proportional to the crimes committed. *See Weems v. United States,* 217 U.S. 340, 367 (1910).  The Supreme Court has in the past assessed Eighth Amendment arguments by comparing the relative culpability and sentences of two different crimes.  *See Kennedy v. Louisiana*, 554 U.S. 407, *op mod on denial of reh*, 554 U.S. 945 (2008) (comparing culpability levels of homicide and rape of child in determining that, under the Eighth Amendment, rape of a child is not sufficiently culpable to warrant capital punishment).

A.     *Eighth Amendment Principles In the Context of Sentencing*

The Court's analysis of Eighth Amendment proportionality in the sentencing context is classified generally in two categories:  (1)  challenges to the length of term-of-years sentences given all the circumstances in a particular case;  and (2)  categorical rules that define Eighth Amendment standards. *Graham v. Florida*, 560 U.S. 48, 59-61 (2010).

In measuring the threshold for "cruel and unusual punishment," the Eighth Amendment is sensitive to, and reflects, "the evolving standards of decency that mark the progress of a maturing society."  *Kennedy v. Louisiana*, 554 U.S. at 419 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).  *See also Helling v. McKinney*, 509 U.S. 25, 36 (1993) (court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency").

The "evolving standards of decency" are measured by "objective factors to the maximum possible extent," *Coker v. Georgia*, 433 U.S. 584, 592 (1977), which include but are not limited to state legislation, sentencing decisions, and the views of entities with relevant expertise.  *Atkins v. Virginia*, 536 U.S. 304, 312 (2002);  *see also State v. Santiago*, 318 Conn. 1, 35 (2015) (expanding on factors considered for determining evolving standards of decency).

As the Supreme Court has explained in the Eighth Amendment context, determining what is cruel and unusual punishment "necessarily embodies a moral judgment.  The standard itself remains the same, but its applicability must change as the basic mores of society change." *Kennedy v. Louisiana*, 554 U.S. at 419 (quoting *Furman v. Georgia*, 408 U.S. 238, 382 (1972) (Burger, C.J., dissenting)).

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 13 of 29

As demonstrated below by the canvass of current, accelerating trends, after decades of increasing the number of mandatory life sentences, there has been considerable change in the perceptions and approaches regarding whether mandatory life sentences are appropriate and/or productive.  As a result, the more recent and pronounced trend, both in the U.S. and internationally, has been in the opposite direction:  eliminating or substantially reducing the instances of mandatory life imprisonment without parole.

In that context, in *United States v. Gonzalez*, 922 F.2d 1044 (2d Cir. 1991), the Second Circuit affirmed a sentence of life imprisonment without parole, and concluded that "the Eighth Amendment does not compel individualized assessment of a defendant facing a mandatory sentence of life imprisonment without parole." *Id*., at 1052.

However, as noted above, the Eighth Amendment's standards are not static;  rather, they evolve to reflect the moral judgments a maturing society reaches with respect to decency.  Now 30 years beyond the sensibilities that prevailed at the time *Gonzalez* was decided, it is respectfully submitted that, consistent with guiding Eighth Amendment principles, its conclusion demands revisiting.

**B.**      ***The Principles of Eighth Amendment "Length of Sentence" Challenges***

In "length of sentence" challenges, a court applies a "narrow proportionality principle [that] does not require strict proportionality between crime and sentence . . . [but rather] forbids only extreme sentences that are 'grossly disproportionate' to the crime."  *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (upholding life sentence without the possibility of parole for defendant convicted of possessing more than 650 grams of cocaine).

**C.**      ***The Principles of Eighth Amendment "Categorical" Challenges***

In categorical challenges, the Court has applied a more liberal test that considers the national consensus on the issue before the Court makes an independent judgment on proportionality.  Until relatively recently the categorical approach has been applied only to a limited line of cases involving the death penalty.  *See Atkins v. Virginia*, 536 U.S. 304 (2002) (prohibiting capital punishment of the intellectually disabled);  *Roper v. Simmons*, 543 US 551 (2005) (prohibiting capital punishment for crimes committed while under the age of 18);  *Kennedy v. Louisiana*, 554 U.S. 407 (prohibiting capital punishment for crimes that did not result in death of an individual, other than crimes against the State).

Nonetheless, in *Graham*, a watershed decision, the Court expanded the categorical

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 14 of 29

approach to prison sentences, and established that Cruel and Unusual Punishment challenges, such as Mr. Madonna's herein, that "implicate a particular type of sentence as it applies to an entire class of offenders who have committed a range of crimes," should be analyzed under the categorical approach.  560 U.S. at 59 (life without parole for juveniles convicted of non-homicide offenses is unconstitutional).

Moreover, in *Graham,* the Court specifically excluded the possibility of applying the traditional approach used in length of term challenges.  *Id.* ("a threshold comparison between the severity of the penalty and the gravity of the crime[, the typical length-of-sentence approach,] does not advance the analysis").

D.      *The Two Elements of the Categorical Test*

The categorical test is composed of two parts.  First, a court must determine whether there exists "a national consensus against the sentencing practice at issue [by identifying an] objective indicia of society's standards, as expressed in legislative enactments and state practice . . ." *Graham*, 560 U.S. at 61.  Next ". . . the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution."  *Id*.

However, society's standards need not be demonstrated solely by state laws.  Even before *Graham*, Eighth Amendment challenges factored in "the views that have been expressed by respected professional organizations, by other nations that share our Anglo-American heritage, and by the leading members of the Western European community."  *Thompson v. Oklahoma*, 487 U.S. 815, 830 (1988) (Eighth and Fourteenth Amendments prohibited execution of defendant convicted of first-degree murder for offense committed when defendant was 15 years old).

1.      *The National Consensus Growing Against Longer Sentences*

a.      *State Legislative Developments*

The "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures."  *Atkins,* 536 U.S. at 312.  In finding a national consensus against the issue in question in *Graham* (whether the Eighth Amendment permitted life imprisonment without parole for juveniles convicted of a non-homicide crime), the Court relied almost exclusively on existing state legislation.  *See Graham*, 560 U.S. at 62.

Examining the state legislation, and deciding there was a national consensus against the sentences at issue in *Graham*, the Court relied on a showing that only 11 jurisdictions nationwide

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 15 of 29

imposed a specific sentence.  *See Graham*, 560 U.S. at 63-65 (noting that 26 states have statutes permitting the sentence, but do not in fact impose it).

In finding a type of sentence to be inconsistent with the national consensus, the Supreme Court has also considered the direction of recent legislative trends.  *See Atkins,* 536 U.S. at 315-316 ("[i]t is not so much the number of these States that is significant, but the consistency of the direction of change"); *Roper*, 543 U.S. at 565-566.  As set forth above, regarding mandatory minimum sentencing, and particularly mandatory life imprisonment without parole, the trends are clear.

> **b.**    *Federal Legislation Reforming Setencing*

Federal legislation also contributes to the national consensus against mandatory life sentences. In late 2018, Congress passed The Formerly Incarcerated Reenter Society Transformed Safely Transitioning Every Person Act, known as the First Step Act, P.L. 115-391, which was signed into law December 21, 2018.  Its provisions can be divided generally into two subject matters:  prison reform, and sentencing reform.

The prison reform prong includes increases in "good time" credit calculation    as much as 70 days over the course of a ten-year sentence, 18 U.S.C. §3624    as well as "early release credits" that inmates can earn through participation in programs, although there are numerous exclusions for certain offense conduct that would render approximately 40% of the current federal prison population ineligible for such credits.  In addition, the Act significantly expands eligibility for "compassionate release" pursuant to 34 U.S.C. §60541 and/or 18 U.S.C. §3582.[5]

In its first year, the FSA yielded tangible positive results for federal inmates.  As the U.S. Bureau of Prisons ("BoP") announced, pursuant to the FSA by late July 2019, BoP had released 3,100 prisoners and reduced approximately 1,691 sentences, as well as increased the number of

---

[5]  The First Step Act built upon 2010's Fair Sentencing Act of 2010, *see* 18 U.S.C. §3582, in which addressed a continuing sentencing inequity by reducing the Sentencing Guidelines disparity between crack and powder cocaine to 18-to-1, thereby confirming that the pre-existing 100-to-1 disparity was too harsh, unfair, and discriminatory.  *See United States v. Gully*, 619 F. Supp.2d 633, 642 (N.D. Iowa 2009) ("[t]he reasons for this court's policy objections to the 100-to-1 ratio apply with equal force to [an 18-to-1] ratio").

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 16 of 29

compassionate release approvals.[6]  As a result, the clear trend is toward reducing the length of federal sentences, and releasing older inmates who suffer from medical problems.

### c.    *International Standards and Practices*

While international standards and practices may not control the outcome of an Eighth Amendment challenge, they certainly inform the discussion. Indeed, in the death penalty context, the complete elimination of capital punishment in the European Union as well as in many other nations, has been noted by the Supreme Court in reaching its decisions on the limits of the death penalty in the U.S.  *See, e.g.*, *Thompson v. Oklahoma*, 487 U.S. at 830 (1988).  *See also Tropp v. Dulles*, 356 U.S. at 102 (in deciding that a punishment of statelessness is unconstitutional, considers, that, "the civilized nations of the world are in virtual unanimity" against such a punishment).  *See also Coker v. Georgia*, 433 U.S. 584, 596 (1977).

More recently, the Court has pointed out that, "[t]he views of the European Union have been relied upon by Justices of this Court (including all four dissenters today) in narrowing the power of the American people to impose capital punishment."  *Kansas v. Marsh*, 548 U.S. 163, 188 (2006).  Similarly, *Kennedy v. Louisiana* includes "international opinion" as one of the indications of national consensus.  554 U.S. at 421.[7]

Examining international standards and practices is illuminating.  The data establish that the United States imposes sentences of life-imprisonment at a staggeringly high rate compared to other countries. *The Sentencing Project,* a nonprofit organization that advocates for sentencing reform and racial equality in the criminal justice system, found that in the U.S. "one in seven people in prison is serving a life sentence." Marc Mauer and Ashley Nellis, "The Meaning of Life," *Sentencing Project*, December 4, 2018, available at bit.ly/2IsTLSd.

---

[6]  *See* "Department Of Justice Announces the Release of 3,100 Inmates Under First Step Act, Publishes Risk And Needs Assessment System," Department of Justice, Office of Public Affairs, July 19, 2019, available at bit.ly/364TjnO;  Douglas Ankney, Dale Chappell, "First Step Act Update: Over 1,600 Sentences Reduced, 3,000 Prisoners Released," Prison Legal News September, 2019, available at bit.ly/2WxKSOM.

[7]  Previously, in *Stanford v. Kentucky*, 492 U.S. 361, 370 (1989), the Court had stated that "American conceptions of decency"    and not international standards    "that are dispositive" for determining sentencing practices but *Sanford* was abrogated by *Roper v. Simmons*, 543 U.S. 551 (2005).

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 17 of 29

That rate exceeds the international norm by a significant margin.  In 2020, as reported by the *Sentencing Project*, "[t]he United States now holds an estimated 40% of the world population serving life imprisonment and 83% of those serving life without the possibility of parole." *Sentencing Project*, "People Serving Life Exceeds Entire Prison Population of 1970," February 20, 2020, available at bit.ly/38gIPBn.

Indeed, according to a February 2020 *Sentencing Project* report entitled *People Serving Life Exceeds Entire Prison Population of 1970*, in 2016 the number of inmates in the U.S. sentenced to life imprisonment without parole exceeded the *total* U.S. prison population in 1970: in 2016 the U.S. had 206,000 persons serving sentences of life imprisonment, while in 1970 the total U.S. prison population was 197,245.[8]  *See also* "Prison Lifer Numbers Now Exceed 1970 Incarcerated Population:  Report," *The Crime Report*, February 25, 2020, available at bit.ly/2Z7JPXN/.

Nor is life imprisonment without parole even an available sentence in the European Union. In fact, in 2013 the European Court of Human Rights ("ECHR") precluded the possibility of a life without parole sentence in the EU, explaining that incarceration,

> without any prospect of release and without the possibility of having his life sentence reviewed, there is the risk that he can never atone for his offence:  whatever the prisoner does in prison, however exceptional his progress towards rehabilitation, his punishment remains fixed and unreviewable.

Nicole Flatow, "Top European Human Rights Court Deems Life In Prison Without Parole Inhuman and Degrading," *Think Progress*, July 10, 2013, available at bit.ly/2vzXsT5.

The ECHR also quoted in its decision the German Federal Constitutional Court, which ruled that "it would be incompatible with the provision on human dignity in the Basic Law for the State forcefully to deprive a person of his freedom without at least providing him with the chance to someday regain that freedom." *Id*.  The March 19, 2020, sentencing letter submitted by co-defendant Christopher Londonio (ECF Dkt # 976), at 3-4, includes specific examples, *i.e.*, France, Norway, Germany, and Italy, and also cites other nations such as Mexico and Namibia, to establish the overwhelming relevant international consensus against life imprisonment without parole.  That letter on Mr. Londonio's behalf also notes the mental and physical suffering that attends a sentence of life imprisonment without parole, including dramatically increased suicide

---

[8]  *The Sentencing Project* report is available at bit.ly/38gIPBn.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 18 of 29

rates.  *Id*., at 4.  Mr. Madonna respectfully incorporates by reference herein that discussion in order to avoid repetition thereof.

As the letter for Mr. Londonio points out, even in cases charging the most heinous offenses   genocide and/or war crimes   a sentence of life without parole is impermissible in the International Criminal Court.  *Id*.  The same is true with respect to various other independent international tribunals adjudicating such matters, as the prospect of release is a component of each of the several systems.

Thus, the consensus, established by state and federal legislation as well as international convention, is that life imprisonment without parole is not an appropriate or humane sentence regardless the offense or offender.

## 2.    *The Court's Independent Judgment*

The second prong of the Categorical Approach, the court's independent judgment, assesses of the "culpability of the offender . . . [in light of] the severity of the punishment in question . . . In this inquiry the Court also considers whether the challenged sentencing practice serves legitimate penological goals."  *Graham*, 560 U.S. at 68.

The Supreme Court has considered four penological goals:  retribution, deterrence, incapacitation, and rehabilitation.  *See Ewing v. California*, 538 U.S. 11, 25 (2003) (plurality opinion).  *See also* 18 U.S.C.§3553(a)(2)(A)-(D).[9]  However, it is not necessary for Mr. Madonna

---

[9]  Those purposes correspond roughly with those enumerated in §3553(a)(2):

(2)    need for the sentence imposed

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)     to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 19 of 29

to prove that the challenged sentence "serves no deterrent or retributive function." *Kennedy v. Louisiana*, 554 U.S. at 441.

In fact, a prison's failure to provide inmates sufficient protection from COVID-19 infection has itself been identified by courts as a likely Eighth Amendment violation. In *Brooks v. Easter,* 20 Civ. 569 (MPS), ECF Dkt #30 (D.Conn 2020), a class of vulnerable inmates at FCI Danbury has claimed that their Eighth Amendment rights have been violated by the FCI Danbury Warden denying inmates' requests for home confinement in light of the coronavirus.

The Court in *Easter,* in granting in part petitioners' request for a temporary restraining order, declared that, "[p]rison officials violate a prisoner's Eighth Amendment right to humane conditions of confinement when two conditions are met.  First, under the 'objective' component of the analysis, 'the alleged deprivation must be 'objectively,' sufficiently serious.'"  *Id.,* at 42. During the coronavirus pandemic, "this requirement is easily satisfied. Courts have long recognized that prison officials have an Eighth Amendment duty to protect inmates from communicable disease." *Id.,* at 43.  *See also Jolly v. Coughlin*, 76 F.3d 568, 477 (2d Cir. 1996).

The Court in *Easter* continued that, ". . .  Second, under the 'subjective' component, prison officials must have acted with a 'sufficiently culpable state of mind,' namely, 'deliberate indifference' to inmate health or safety" *Id,* at 43.  In the case of a class of inmates at FCI Danbury, the Court has found preliminarily that the Warden has, indeed, demonstrated deliberate indifference by not releasing inmates to home confinement.  Thus, Mr. Madonna has already suffered an Eighth Amendment deprivation.

Here, also, given Mr. Madonna's age ███████████████████████ as well as other factors discussed above, at 3-10, neither deterrence, incapacitation, nor rehabilitation require a sentence of life imprisonment without parole in order for those objectives to be accomplished.  Indeed, imprisonment would be gratuitous with respect to any of those purposes. *See also* below, at POINT III.

Regarding retribution, several factors merit consideration.  For example, as discussed below, at 22, 27-28, the evidence against Mr. Madonna with respect to Count Three, even if sufficient, was certainly not of such convincing character to warrant a sentence of life imprisonment without parole.  In that context, the concept of "residual doubt" is relevant here.  As Justice O'Connor explained in *Franklin v. Lynaugh*, 487 U.S. 164 (1988) (O'Connor, J., concurring), "'[r]esidual doubt'" refers to "a state of mind that exists somewhere between 'beyond

treatment in the most effective manner;

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 20 of 29

a reasonable doubt' and 'absolute certainty.'" *Id.*, at 188.  *See also* Patrick Mulvaney & Katherine Chamblee, *Innocence and Override*, YALE LAW JOURNAL, Forum, August 8, 2016, Vol. 126, 2016-2017, at 119, available at <https://www.yalelawjournal.org/forum/innocence-and-override>.

As the *Yale Law Journal* article notes, "[t]he reported experiences of capital jurors reveal that this space between reasonable doubt and no doubt at all plays a pivotal role in sentencing decisions." *Id.*  Thus, "[e]ven when jurors believe that a particular defendant was involved in the offense at issue, they often have doubts about what role he played and whether he had the specific intent to kill, . . ." *Id.*

Justices Marshall and Stevens recognized the impact the quantum of proof   even when sufficient to convict   could have on sentencing.  For example, in *Heiney v. Florida*, 469 U.S. 920 (1984) Justice Marshall, dissenting from the denial of *certiorari*, remarked that "[t]he belief that [the death penalty] is inappropriate where there are doubts as to guilt, even if they do not rise to the level necessary for acquittal, is a feeling that stems from common sense and fundamental notions of justice." *Id.*, at 921-22 (Marshall, J., dissenting from the denial of certiorari). Similarly, in *Spaziano v. Florida*, 468 U.S. 447 (1984), *overruled in part by Hurst v. Florida*, 136 S. Ct. 616 (2016), Justice Stevens pointed out in dissent that "[i]t may well be that the jury was sufficiently convinced of petitioner's guilt to convict him, but nevertheless also sufficiently troubled by the possibility that an irrevocable mistake might be made . . . that [it] concluded that a sentence of death could not be morally justified in this case." *Id.*, at 488 n.34 (Stevens, J., dissenting).

Here, the principles applicable to capital sentencing are quite relevant because a federal sentence of life imprisonment without parole is the functional equivalent of a death sentence. Likewise, the practical effect for Mr. Madonna, given his age ███████████████████████, is even more immediate in that regard.

Also, the inclusion of a theory of liability pursuant to *Pinkerton v. United States*, 328 U.S. 640 (1946), permitted the jury to find Mr. Madonna guilty on Count Three even if he did not participate in the murder *at all* (but merely was part of a conspiracy in which the homicide was reasonably foreseeable).

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 21 of 29



(Emphasis added).  *See also* October 19, 2020, from Joshua L. Dratel (seeking severance), at 4.[10]

     Thus, a number of factors peculiar to Mr. Madonna compel the independent judicial judgment that the murder of Mr. Meldish is not among the character of offenses that warrant, for any reasonable goal of sentencing, a sentence for Mr. Madonna of life imprisonment without parole.

---

[10]



LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 22 of 29

III.     *The Evidence at Trial and Other Information and Materials Provided by the Government Establish That Mr. Madonna Does Not Present a Risk of Recidivism*

Evidence the government introduced at trial, through the testimony of John Pennisi and certain recorded conversations establish beyond dispute that Mr. Madonna, assuming *arguendo* he ever was the acting street boss of the Luchese Family, was replaced in that role in approximately 2014 as a result of the Brooklyn faction of the Luchese Family reasserting control over the organization's operations.  *See, e.g*., T. 1463.[11]

That any authority wielded by Mr. Madonna had been eliminated was reinforced the following year, 2015, when he began serving companion concurrent prison sentences as a result of his pleas of guilty to charges in both New York State and New Jersey.  *See also* below, at POINT IV.  Mr. Madonna has been incarcerated since (as his state sentences expired while he was in pretrial custody in this case).  Obviously, he could not serve as the alleged "street boss" of the Luchese Family (as the substitute for the incarcerated formal "boss") while he, too, was imprisoned.

Consequently, even if Mr. Madonna presented any risk of recidivism (which he does not for the reasons set forth above, at 10-11), he would not have the opportunity or platform from which to engage in criminal activity in the future.  His age, his neurological and medical condition — especially following his COVID-19 infection — as well as the Luchese Family dynamics, preclude any such conduct.

IV.     *The Five-Year State Prison Term Mr. Madonna Served for Conduct Fully Incorporated in This Case Should Reduce His Sentence Herein Accordingly*

As the government established at trial by Stipulation (GX 1507, which authenticated and admitted Mr. Madonna's respective guilty plea allocutions (GX 221-C & GX 222-C) and judgments (GX 221-B & GX 222-B), Mr. Madonna pleaded guilty January 12, 2015, in New York State to "enterprise corruption" in violation of New York's Organized Crime Control Act ("OCCA"), and in New Jersey June 17, 2015, to a violation of that state's racketeering statute.

As the government argued in seeking admission of the convictions, and to the jury in opening and summation the conduct underlying both the New Jersey and New York State convictions was encompassed entirely by the allegations in this case.  *See* T. 571, 4310.  *See also* PSR, at ¶¶ 50 & 51 ("criminal conduct" in New York State and New Jersey cases "is considered

---

[11]  "T." refers to the trial transcript in this case.

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 23 of 29

part of the instant offense").

        As a result, Mr. Madonna was sentenced to concurrent prison terms    five years in New Jersey, and 1-3 years in New York State    that he commenced serving September 30, 2015. Those sentences expired February 7, 2019, while Mr. Madonna was already in pretrial custody in this case.  However, because he was in the "primary custody" of New Jersey at the time of his arrest, Mr. Madonna will not receive credit from BOP towards his sentence in this case for any of the time prior to the expiration of the New Jersey and New York State sentences.

        Nor can the Court either direct that any of that time be concurrent with the sentence in this case, or even recommend that the BOP credit Mr. Madonna with that time because §5G1.3 of the Sentencing Guidelines and 18 U.S.C. §3584(a) do not authorize the Court to allocate credit (or recommend it) for any state sentence already discharged by the time of sentencing    even for conduct that is "relevant conduct" or even part of the instant offense.  *See* §5G1.3(b) & (c).

        Thus, the only means by which the Court can account for the imprisonment Mr. Madonna served for conduct fully incorporated in this case, and vindicate the spirit of §§5G1.3(b) & (c) and fundamental fairness, is by sentencing Mr. Madonna to less imprisonment equaling the term he served than it would otherwise.

**V.**



LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 24 of 29



**VI.**    ***The Harsh Conditions Mr. Madonna Experienced During His 20
Months at MDC Should Be Factored Into the Court's Sentencing Decision***

Mr. Madonna spent approximately 20 months at MDC before his transfer to WCCC in
February 2019.  The harsh conditions at pretrial facilities    including lack of ample programming,
limited family visits, and lack of exposure to sunlight and the outside    are well known to the
courts.  *See, e.g., Bell v. Wolfish*, 441 U.S. 520 (1979);  *United States v. Gallo*, 653 F.Supp. 320,
336 (E.D.N.Y. 1986).

**1.**    ***The Awful Conditions at MDC During Mr. Madonna's Confinement There***

During the winter of 2019 (the last week of January through the first week of February),
while Mr. Madonna was still confined there, MDC experienced an extended power failure for an
entire week that created appalling and unconscionable conditions in which inmates were deprived
of the essentials of daily living:  heat, light, access to medical care (including medication),
movement or exercise, and phone or other access to the outside world.  The absence of electricity
impaired cooking, and the meals provided to detainees were minimal and infrequent.  In addition,
detainees were denied social or legal visits.[12]

---

[12]   The latter deprivation was subsequently the subject of a class action lawsuit filed by
the Federal Defenders of New York, suing MDC Warden Herman Quay for injunctive relief on
behalf of MDC detainees against.  *See, e.g., Scott v. Quay*, 19 Civ. 1075 (MKB/LB) (ECF Dkt

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 25 of 29


In an unrelated but simultaneous event, MDC's heating system also failed.  The heat and power crises occurred during a week when temperatures in New York City were in the single digits.  Thus, MDC detainees experienced a week of temperatures well below freezing, and dark conditions without heat.[13]  Moreover, according to the Federal Defenders' account, despite the extreme cold, and the ambient temperature hovering at approximately 43 degrees    inmates were not provided additional blankets or clothing (and did not have access to the commissary).  Nor were they allowed to leave their cells for normal activities.

The horrendous conditions extended beyond cold temperatures and complete darkness.  The tap water turned brown and was subsequently shut off.  As a result, there was no water, and eventually the toilet was also shut down.  Inmates were not even provided bottled water.  Thus, the conditions exceeded extreme discomfort, and constituted unsafe and cruel treatment, especially for an octogenarian like Mr. Madonna.

In addition, routine medical attention and administration of medication was halted.  Inmates were unable to request medical treatment because that is accomplished by computer, and that entire system was inoperable.[14]  The CorrLinks email system was also disabled, and visits

---

#1);  *Federal Defenders of New York v. Federal Bureau of Prisons*, 19 Civ. 660 (MKB/SMG).  The Federal Defenders' action has been dismissed by the District Court on standing/subject matter jurisdiction grounds;  the appeal from that ruling is pending.

[13]  *See* Annie Correal, Andy Newman and Christina Goldbaum, "Protesters Try to Storm Brooklyn SJail With Little Heat or Electricity," *The New York Times*, February 2, 2019, available at nyti.ms/2DRypfF.

[14]  Generally, medical care in pretrial facilities is substandard.  As noted in a 2015 VERA Institute of Justice report,

> [g]iven high levels of need and the constant churning of their population, most jails struggle to deliver health care that meets minimally accepted standards of care in the community.  This is particularly critical as people in jail report high rates of medical problems.[]  Moreover, conditions in jail    especially crowding and poor sanitation    can be especially harmful to the many in custody with chronic health problems, particularly mental illness, and facilitate the spread of contagious diseases.[]

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 26 of 29

either attorney or family/social   were not permitted.  *See also* Ginia Bellafante, "How a Brooklyn Jail Without Heat Inspired So Much Outrage," *The New York Times*, Feb. 7, 2019, available at <https://nyti.ms/2DYFyuH>;  Annie Correal and Joseph Goldstein, "'It's Cold as Hell': Inside a Brooklyn Jail's Weeklong Collapse," *The New York Times*, Feb. 9, 2019, available at <https://nyti.ms/2E41MeL> .  These circumstances caused extraordinary distress, because without guards or medical attention, the safety of inmates was in peril.

### 2.    *Courts Have Found Conditions at MDC to Be a Basis for a Reduced Sentence*

Even prior to *United States v. Booker*, 543 U.S. 220 (2005), courts held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departure." *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001).  *See also United States v. Farouil*, 124 F.3d 838, 847 (7th Cir.1997) (harsh conditions of confinement constitute valid ground for departure);  *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n. 2 (2d Cir. 1996) (remanding for reasons for downward departure due to "harsher incarceration" due to unavailability of programs);  *United States v. Brinton*, 139 F.3d 718, 725 (9th Cir. 1998);  *United States v. Mateo*, 299 F. Supp.2d 201 (S.D.N.Y. 2004);  *United States v. Francis,* 129 F. Supp.2d 612, 616 (S.D.N.Y. 2001), *citing United States v. Sutton*, 973 F. Supp. 488, 491-495 (D.N.J. 1997).

Post-*Booker*, in *United States v. Behr*, 2006 WL 1586563 (S.D.N.Y. 2006), the Court noted that a judge had "reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at MCC[.]"  2006 WL 1586563, at *5.  In light of the harsh conditions at MCC, the defendant in *Behr* was sentenced to a non-Guidelines sentence.  *Id.*[15]

The same applies to MDC.  The difficult and overcrowded conditions at MDC simply make every day at the facility more onerous than ordinary confinement.  *See United States v.*

---

Ram Subramanian, Ruth Delaney, Stephen Roberts, Nancy Fishman, and Peggy McGarry, *Incarceration's Front Door: The Misuse of Jails in America*, VERA Institute of Justice, February 2015 (hereinafter "*Front Door*"), at 17 (footnotes omitted), available at <http://www.vera.org/sites/default/files/resources/ downloads/incarcerations-front-door-report_02.pdf>.

   [15]  *See also* Ken Strutin, "Cognitive Sentencing and the Eighth Amendment," *New York Law Journal*, March 24, 2015, available at <http://www.newyorklawjournal.com/expert-analysis/id  1202721348619/Cognitive-Sentencing-and-the-Eighth-Amendment?mcode  1380566174563&curindex  11>;  *United States v. Gallo*, 653 F. Supp. 320, 336 (E.D.N.Y. 1986).

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 27 of 29

*Spano*, 476 F.3d 476, 479 (7th Cir. 2007) ("in effect [the defendant] is arguing that the severity of a prison sentence has two dimensions:  its length, and the harshness of the conditions, and that the harsher the conditions the shorter the sentence should be.  There is enough merit to the argument to allow a sentencing judge to take it into account . . .").

Accordingly, it is respectfully submitted that an adjustment below the Guidelines and the PSR's recommendation is appropriate to account for Mr. Madonna's extended 20-month pretrial custody at MDC, particularly during the period of the power and heating failure in which the conditions were inhumane and intolerable.

## VII.    *Mr. Madonna's Objections to the PSR*

Mr. Madonna's objections to the PSR were communicated to the Probation Officer in a February 12, 2020, letter from counsel, which is attached hereto as Exhibit 6.  Mr. Madonna reasserts them herein, as the Probation Officer declined to amend the PSR in any respect in response to those objections.

### 1.    *Mr. Madonna Was Not Involved in the Murder of Michael Meldish*

Mr. Madonna also augments his objections to ¶ 27 by again declaring that he was not in any way responsible for the murder of Michael Meldish.  Before his untimely death, Tom Clancy wrote a series of techno-spy thrillers that were consistently best sellers.  In his writing, the spy satellites, weapon systems, and other technology that play a central role in Mr. Clancy's stories always worked the way they were supposed to work.  The major criticism of Mr. Clancy's writing is that in the real world, things rarely work the way they are supposed to work according to the manufacturers' specifications.

In this case, the government's theory is that the murder of Michael Meldish could not have occurred without the approval of a person in Mr. Madonna's alleged position of authority.  Other than the description of how things are *supposed* to work, provided by Special Agent Carillo, the government did not offer a single witness, recording, or other evidence that Mr. Madonna had in fact approved or ordered, or even knew of in advance, the murder of Michael Meldish.  While Mr. Madonna and counsel acknowledge that the jury found otherwise, the simple fact is that despite how things are supposed to work, Mr. Madonna had nothing to do with the death of Michael Meldish.

Also, evidence at trial, and evidence precluded from trial, included allegations that others were responsible for Mr. Meldish's murder.  For example, Brian Vaughan provided a compelling

LAW OFFICES OF

**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 28 of 29

rationale why the Genovese Family was responsible for the murder, and how the debt Mr. Meldish allegedly owed Mr. Madonna contributed to the murder even absent Mr. Madonna's participation, knowledge, or approval. *See* Government's January 11, 2019, Memorandum of Law in Support of Motions *In Limine*, and the October 29, 2019 letter from Mr. Madonna's counsel (subsequently docketed as part of ECF Dkt # 902), and proposed GX 701-T. Likewise, ample evidence pointed to members of the Bonnano Family as the persons who killed Mr. Meldish for reasons well-documented in the evidence and other submissions throughout the course of the case.

In addition, other evidence, marshaled and argued by the government in its December 11, 2019, supplemental sentencing submission to the Court with respect to co-defendant Joseph DiNapoli, ECF Dkt # 917   and contradicting the position the government advanced at trial herein strongly supports the conclusion that, indeed, Mr. Meldish's murder did not occur according to the formal hierarchal protocols about which SA Carillo testified and the government argued to the jury. In its December 11, 2019, letter, the government emphasizes the close relationship between Mr. DiNapoli and Christopher Londonio, including that Mr. Londonio was the conduit for extortionate loans made with Mr. DiNapoli's money, that Mr. Meldish also collected payments on extortionate loans for Mr. DiNapoli, that Mr. DiNapoli sponsored Mr. Londonio for formal membership in the Luchese Family, that Mr. DiNapoli and Mr. Londonio had a very close relationship, and that Mr. Londonio essentially worked for Mr. DiNapoli, at the time the third-highest ranking official in the Luchese Family.

Also, counsel's October 18, 2019, letter seeking severance quotes the additional information received from the government, *see* above, at 21, that reinforces the prospect that Mr. Londonio acted on behalf of Mr. DiNapoli.1:  a source had informed the government that "[i]n 2013, Christopher Londonio conveyed to Meldish that Joseph DiNapoli said come in and resolve this with Madonna, you have nothing to worry about[.]"

2.    ***The Court Should Not Use the Guideline for First-Degree Murder***

Mr. Madonna joins and adopts co-defendant Steven Crea's position and reasons for the conclusion that the PSR erred in using the first-degree murder Guideline for Mr. Meldish's murder.

3.    █████████████████████████████

LAW OFFICES OF
**DRATEL & LEWIS**

Hon. Cathy Seibel
United States District Judge
Southern District of New York
May 18, 2020
Page 29 of 29



## VIII.  *Designation Issues*

It is respectfully requested that the Court recommend that Mr. Madonna be designated to a Federal Medical Center as close to New York as possible.

### Conclusion

Accordingly, for all the reasons set forth above, and all the papers filed and arguments made in this case, including the evidence at trial, it is respectfully submitted that Mr. Madonna should not be sentenced to an extensive additional term of imprisonment.  Also, as noted above, counsel also respectfully request that in light of the current COVID-19 pandemic, they be permitted to enlarge and supplement this submission once it is medically safe for Mr. Madonna to meet with his counsel ██████████████.

Respectfully submitted,

Joshua L. Dratel
Andrew G. Patel
*Attorneys for Defendant Matthew Madonna*

JLD/
Encls.