UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,         :

         *- against -*         :         17 Cr. 89 (CS)

MATTHEW MADONNA,         :

         Defendant.         :
-------------------------------------------------------X


### MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR MODIFICATION OF SENTENCE PURSUANT TO 18 U.S.C. §3582(C)(1)(a)


### FILED UNDER SEAL


JOSHUA L. DRATEL
Dratel & Lewis
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-0707
jdratel@joshuadratel.com

ANDREW G. PATEL
15 Chester Avenue
White Plains, New York 10601
(212) 349-0230
apatel@apatellaw.com

*Attorneys for Defendant*
*Matthew Madonna*

Table of Contents

Table of Contents.................................................................................................i

Table of Authorities...........................................................................................v

Introduction.......................................................................................................1

The Applicable Standard for Considering
§3582 Motions Based on a Defendant's Medical Circumstances.....................2

Statement of the Facts.......................................................................................4

A. Dr. Chen's Declaration Analyzing Mr. Madonna's Medical Records......................4

1. Dr. Chen's Credentials, Experience, and Review of Mr. Madonna's Records...........4

2. Dr. Chen's Conclusions.................................................................................4

3. The Bases in Mr. Madonna's BOP Medical Records Supporting Dr. Chen's Conclusions........6

███████████████████████████████████..................................6

████████████████████.................................................7

███████████████████...............................................7

█████████████████████████████.................................8

████████████████████████████████████...................9

██████████████████████..................................................10

B. Mr. Madonna's BOP Medical Records Confirm the
Analysis and Conclusions in Dr. Chen's Declarations,
and Detail the Diverse Decline in Mr. Madonna's Health.................................10

1. Dr. Jason Krellman's August 2019 Pre-Trial
Neuropsychological Examination and Report....................................................12

2. A Chronology of Mr. Madonna's Mental and Physical Deterioration
Since the November 2019 Conclusion of the Trial In This Case......................15

██████████████████████████████..........................................15

i

b. 2021: The Covid-19 Pandemic Continues and
    Mr. Madonna Is Transferred to USP McCreary...............................................18

c. 2022: Mr. Madonna Remains at USP McCreary.....................................................19

d. 2023: Mr. Madonna Still Remains at
    USP McCreary While His Health Declines Further............................................20

e. 2024: Mr. Madonna Is Finally Transferred to an FMC............................................25

███████████████████████████████████████████████████████████.........................27

C. Mr. Madonna Has Exhausted His Administrative Remedies....................................28

ARGUMENT...................................................................................................30

POINT I

MR. MADONNA'S MOTION SHOULD BE GRANTED
    BECAUSE HE SATISFIES THE CRITERIA SET FORTH
    FOR "MEDICAL CIRCUMSTANCES OF THE DEFENDANT
    ENUMERATED IN SENTENCING GUIDELINES §1B1.13(b)(1)(B)..........................30

A. Cases Involving Aged Defendants Suffering from Serious Medical Issues.............................30

2. The Court's Approach and Decisions Regarding
    §3582 Motions Filed By Mr. Madonna's Co-Defendants.................................37

POINT II

Several Additional Considerations Justifying Granting Mr. Madonna's Motion..........................41

A. Mr. Madonna Was Incarcerated Through the Entirety of the
    Covid-19 Pandemic, and Has Manifested the Symptoms of
    "Long-Covid," Which BOP Does Not Treat....................................................41

B. Mr. Madonna Has Since His First Covid-19 Infection in April 2020
    Manifested Multiple Symptoms of "Long Covid,"
    Which BOP Neither Recognizes Nor Treats....................................................44

1. Long Covid Is Now Recognized and Defined...........................................................45

2. The Litany of Symptoms Associated with Long Covid

████████████████████████...................................................46

3. Specific Aspects of Long Covid Vulnerability and
      Severity ██████████████████████...........................................47

4. Studies Have Established the Cognitive Damage from Long Covid.........................................48

5. Long Covid Is Not Subject to a Diagnostic Test, and
      a Recognized Course of Treatment Does Not Yet Exist...................................................50

6. Long Covid Exacts a Significant Physical and Psychological Toll..........................................51

C. BOP Is Not Capable of Providing Mr. Madonna an Appropriate Level of Care....................54

1. BOP Medical Facilities Are Suffering Staff Deficits
      That Adversely Affect the Level of Care Provided to Older Inmates..............................56

a. The DOJ OIG's December 2024 Report Regarding FMC Devens...........................................56

b. The Crisis in Delivering Adequate Health Care Exists Throughout the BOP System..............59

c. The OIG's May 2024 Report on BOP's Failures
      to Screen and Follow Up for Colorectal Cancer.................................................64

i. Insufficient and Episodic Screening for CRC........................................................65

ii. Insufficient Documentation and Computer Records Capability.................................................66

iii. Insufficient Follow-Up for Positive CRC Screening Results...................................................67

iv. Intolerable Delays in Performing Colonoscopies.........................................................68

2. BOP Has Failed to Account for the Practical and Economic Impact of
      the Increased Proportion of an Aging U.S. Federal Prison Population...........................69

3. BOP Generally Is In Crisis In Multiple Facets of Its Mission and Obligations.......................72

D. The Sentencing Commission's "Compassionate Release Data Reports"................................78

E. Mr. Madonna's Imprisonment for State Offenses Formally Incorporated
      In This Case Extends His Incarceration Beyond the Threshold 10-Year
      Minimum for Eligibility for Relief Pursuant to Guidelines §1B1.13(b)(2)......................81

F. Mr. Madonna Was Willing to Resolve His Case With a Plea of Guilty..................................83

G. Distance Has Made Family Access for Visits to Mr. Madonna Impossible.............................83

POINT III

ANALYSIS OF THE §3553(a) WEIGHS DECIDEDLY
    IN FAVOR OF GRANTING MR. MADONNA'S §3582 MOTION...............................84

A. Even Defendants Who Have Committed the Most Serious Offenses
Have Been Granted Modification of Sentence for Various Reasons.............................................84

B. In His Physically and Cognitively Compromised
    (and Deteriorating) Condition, Mr. Madonna
    Does Not Present Any Danger to the Community or of Recidivism................................89

C. Granting Mr. Madonna's §3582 Would Not Create an Unwarranted Disparity......................92

Conclusion.................................................................................................................................94

Table of Authorities

Cases

May v. Shinn, 37 F. 4th 552 (9th Cir. 2022)...............................................................93

Miner v. United States, 16 Cr. 23 (PAC), 2023 WL 3222394 (S.D.N.Y. May 2, 2023).............31

Minicone v. United States, 353 F. Supp. 2d 316 (N.D.N.Y. 2005)................................33

Scott v. Quay, 19 Civ. 1075 (MKB/LB).....................................................................12

United States v. Asaro,
        17 Cr. 127, 2020 WL 1899221 (E.D.N.Y. Apr. 17, 2020)................................91

United States v. Bardell, 634 F. Supp. 3d 1083 (M.D. Fla. 2022).................................69

United States v. Beck, 425 F. Supp. 3d 573 (M.D.N.C. 2019)......................................32

United States v. Bellamy,
        15 Cr. 1658, 2019 WL 3340699 (D. Minn. July 25, 2019)...............................90

United States v. Booker, 543 U.S. 220 (2005)............................................................79

United States v. Brady, 18 Cr. 316 (PAC), 2021 WL 200512, (S.D.N.Y. Jan. 20, 2021).............31

United States v. Brooker, 976 F.3d 228 (2d Cir. 2020).....................................................3

United States v. Chan, 645 F. Supp. 3d 71 (E.D.N.Y. 2022)........................................87

United States v. Cromitie,
        09 Cr. 558 (CM), 2024 WL 216540 (S.D.N.Y. January 19, 2024)............................41, 42

United States v. Fisher, 493 F. Supp.3d 231 (S.D.N.Y. 2020)......................................92

United States v. Freeman, 96 Cr. 527 (PKC),
        2023 WL 6517466 (E.D.N.Y. Oct. 5, 2023).................................................34, 35

United States v. Garcia,
        01 Cr. 1110 (LAP), 2025 WL 1004409 (S.D.N.Y. April 3, 2025)....................................87

United States v. Gigante, 925 F. Supp.2d 967 (E.D.N.Y. 1996)....................................90

v

United States v. Gigante,
      982 F. Supp. 140 (E.D.N.Y. 1997), aff'd, 166 F.3d 75 (2d Cir. 1999)..............................90

United States v. Griffin,
      22 Cr. 408 (EK), 2024 WL 2891686 (E.D.N.Y. June 10, 2024).......................................37

United States v. Johnson, 671 F. Supp.3d 271 (E.D.N.Y. 2023)....................................................37

United States v. Johnson, 754 F. Supp. 3d 305 (E.D.N.Y. 2024)...................................................89

United States v. Khan, 18 Cr. 830 (VSB), 2023 WL 2911021 (S.D.N.Y. Apr. 11, 2023)............31

United States v. Kohler, 15 Cr. 425 (CEH-CPT),
      2022 WL 780951 (M.D. Fla. Mar. 15, 2022)....................................................................32

United States v. Lizardi, 11 Cr. 1032 (PAE) (S.D.N.Y. Oct. 9, 2020).........................................42

United States v. Millan, No. 91 Cr. 685 (LAP)
      2020 WL 1674058 (S.D.N.Y. April 6, 2020).............................................................88, 92

United States v. Miller, No. 92-CR-91, 2024 WL 4107211 (E.D.N.Y. Sept. 6, 2024).................89

United States v. Minicone, 521 F. Supp. 3d 163 (N.D.N.Y. 2021).........................................33, 91

United States v. Monteleone, 92 Cr. 351 (ARR),
      2023 WL 2857559 (E.D.N.Y. April 10, 2023)..................................................34, 43, 91

United States v. Moore, 90 Cr. 10603 (FB) (E.D.N.Y. 2022)......................................................86

United States v. Morse, 10 Cr. 20361 (DMM), 2020 WL 6534899 (S.D. Fla. Nov. 3, 2020) .....33

United States v. Ng Lap Seng,
      15 Cr. 706 (VSB), 2021 WL 961749 (S.D.N.Y. Mar. 15, 2021).....................................43

United States v. Ortega,
      13 Cr. 814 (JMF), 2023 WL 2752160 (S.D.N.Y. Mar. 31, 2023)........................32, 90, 91

United States v. Quinones,
      00 CR. 761-1 (JSR), 2021 WL 797835 (S.D.N.Y. Feb. 27, 2021).............................35, 86

United States v. Phillips, 469 F. Supp.3d 180 (S.D.N.Y. 2020)....................................................36

United States v. Piggott, 94 Cr. 417, 2022 WL 118632 (S.D.N.Y. Jan 12, 2020).................88, 91

United States v. Rice,
          No. 83 CR. 150-3 (LGS), 2020 WL 4505813 (S.D.N.Y. Aug. 5, 2020)..........................92

United States v. Robles,
          19 Cr. 4122 (LAB), 2022 WL 229362 (S.D. Cal. Jan. 26, 2022) .....................................32

United States v. Rodriguez,
          00 Cr. 761 (JSR) 2020 WL 5810161 (S.D.N.Y. Sept. 30, 2020) .........................35, 43, 86

United States v. Rodriguez, 492 F. Supp. 3d 306 (S.D.N.Y. 2020)........................................44, 91

United States v. Russo, 2022 WL 17247005 (E.D.N.Y. November 28, 2022)................42, 43, 44

United States v. Russo, 643 F. Supp.3d 325 (E.D.N.Y. 2022).........................................85, 86, 87

United States v. Russo,  90 Cr. 1063, 2022 WL 16627450 (E.D.N.Y. Nov. 2, 2022)...........33, 34

United States v. Romero, 15 Cr. 445-18 (PAE),
          2021 WL 1518622 (S.D.N.Y. Apr. 16, 2021).....................................................................42

United States v. Tagliaferro, 19 Cr. 472 (LAP),
          2024 WL 5077350 (S.D.N.Y. Dec. 11, 2024).......................................................4, 31, 92

United States v. Tavarez,
          22 Cr. 430 (RA), 2024 WL 5004525 (S.D.N.Y. Dec. 6, 2024)........................................31

United States v. Tidwell, 476 F. Supp.3d 66 (E.D. Pa. 2020).......................................................85

United States v. Tirado,
          15 Cr. 487 (GBD), 2021 WL 392029 (S.D.N.Y. Feb. 4, 2021)........................................31

United States v. Torres, 464 F. Supp.3d 651 (S.D.N.Y. 2020).......................................................88

United States v. Vargas, 502 F. Supp. 3d 820 (S.D.N.Y. 2020)......................................................3

United States v. Vaughn, 62 F.4th 1071 (7th Cir. 2023).................................................................3

United States v. Williams,
          No. 09 Cr. 558 (CM), 2023 WL 4785286 (S.D.N.Y. July 27, 2023)...............................41

United States v. Wong, 90 Cr. 1019 (RJD) (E.D.N.Y. April 8, 2016).........................................87

United States v. Snype, F. Supp. 3d , 2023 WL 4622870 (E.D.N.Y. July 19, 2023)...................35

Statutes & Other Authorities

18 U.S.C. §1B1.13, Application Note 1(A)(ii)........................................................32

18 U.S.C. §1B1.13(B)(1)(b)............................................................................35

18 U.S.C. §1B1.13(b)(2)................................................................................83

18 U.S.C. §1B1.13(b)(5)..................................................................................3

18 U.S.C. §1959(a)(1)..................................................................................84

18 U.S.C. §3500........................................................................................90

18 U.S.C. §3553(a)....................................................................40, 85, 87, 89, 93

18 U.S.C. §3553(a)(2)(B)-(C)........................................................................92

18 U.S.C. § 3553(a)(2)(C)............................................................................85

18 U.S.C. §3553(a)(2)(D)............................................................................89

18 U.S.C. §3553(a)(6)................................................................................92

18 U.S.C. §3582...............................................1, 2, 3, 30, 31, 32, 33, 34, 35, 36, 38, 41, 79,
80, 81, 82, 83, 84, 85, 87, 88, 89, 90, 92, 94

18 U.S.C. §3582(C)(1)(a)................................................................................1

18 U.S.C. §3582(c)(1)(A)................................28, 29, 36, 37, 38, 39, 41, 42, 79

18 U.S.C. §3582(c)(1)(A)(i)..........................................................................85

18 U.S.C. §3582(c)(1)(A)(I)..........................................................................31

21 U.S.C. §848(a)......................................................................................88

21 U.S.C. §848(b)......................................................................................88

**Introduction**

This Memorandum of Law is respectfully submitted on behalf of defendant Matthew

Madonna, and in support of his motion for modification of his sentence pursuant to 18 U.S.C.

§3582(C)(1)(a).  Mr. Madonna is now 89 years old, and is confined at the Federal Medical

Center in Rochester, Minnesota ("FMC Rochester").

For the reasons set forth below, it is respectfully submitted that Mr. Madonna's sentence

should be modified to time-served because, as Dr. Isabel Chen's Declaration Regarding the

Health Status of Matthew Madonna ("Dr. Chen's Declaration") (attached hereto as Exhibit 1),

states



Exhibit 1.

Consequently, Mr. Madonna satisfies the criteria enumerated in the U.S. Sentencing

Guidelines, as amended in 2023, which prescribe that the requisite "extraordinary and

compelling reasons" for a motion pursuant to §3582 include the "medical circumstances of the

defendant," to the extent the defendant is:

"(i)     suffering from a serious physical or medical condition,

(ii)    suffering from a serious functional or cognitive impairment, or

(iii)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the

1

environment of a correctional facility and from which he or she is not expected to recover."
U.S.S.G. §1B1.13(b)(1)(B).

If released, Mr. Madonna would live with his only surviving relative, ███████████████

███████████████████████

Accordingly, it is respectfully submitted that the Court should grant Mr. Madonna's
motion, modify his sentence to time served, and order his immediate release from custody.

### *The Applicable Standard for Considering §3582*
### *Motions Based on a Defendant's Medical Circumstances*

In 2023, the Sentencing Guidelines were amended to define more precisely, and at the
same time more expansively, when a defendant's medical circumstances constitute
"extraordinary and compelling reasons" sufficient to warrant granting a motion to modify a
sentence.

The amended §1B1.13(b) provides as follows:

(b)      Extraordinary and Compelling Reasons.– Extraordinary and compelling reasons
         exist under any of the following circumstances or a combination thereof:

    (1)      Medical Circumstances of the Defendant.–

        (A)      The defendant is suffering from a terminal illness (*i.e.*, a serious
                  and advanced illness with an end-of-life trajectory).  A specific
                  prognosis of life expectancy (*i.e.*, a probability of death within a
                  specific time period) is not required.  Examples include metastatic
                  solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage
                  organ disease, and advanced dementia.

        (B)      The defendant is –

            (i)      suffering from a serious physical or medical condition,

            (ii)      suffering from a serious functional or cognitive
                  impairment, or

(iii)    experiencing deteriorating physical or mental health
        because of the aging process,

that substantially diminishes the ability of the defendant to provide
self-care within the environment of a correctional facility and from which
he or she is not expected to recover.

(C)    The defendant is suffering from a medical condition that requires
        long-term or specialized medical care that is not being provided
        and without which the defendant is at risk of serious deterioration
        in health or death.

(2)    Age of the Defendant. – The defendant (A)  is at least 65 years old;  (B)  is
        experiencing a serious deterioration in physical or mental health because of the
        aging process;  and (C)  has served at least 10 years or 75 percent of his or her
        term of imprisonment, whichever is less.

In addition, consistent with §3582 motions generally, and with the Second Circuit's

opinion in *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020), after determining whether

"extraordinary and compelling circumstances" are present, the Court also "consider[s] the factors

set forth in section 3553(a) to the extent that they are applicable[.]"  18 U.S.C. §3582(c)(1)(A)(i).

Ultimately, as the Court noted in *United States v. Vargas*, 502 F. Supp. 3d 820 (S.D.N.Y.

2020), "the district court has broad discretion in evaluating a defendant's motion for

compassionate release," *id*., at 824, and the Second Circuit has likewise explained that courts

may "consider the full slate of extraordinary and compelling reasons that an imprisoned person

might bring before them . . ."  *Brooker*, 976 F.3d at 237.

Moreover, §1B1.13(b)(5), "Other Reasons," permits a court to consider – and grant a

motion based on – "any other circumstance or combination of circumstances that, when

considered by themselves or together with any of the reasons described in paragraphs (1) through

(4), are similar in gravity to those described in paragraphs (1) through (4)."  *See also United*

*States v. Vaughn*, 62 F.4th 1071, 1073 (7th Cir. 2023) ("a combination of factors may move any

3

given prisoner past [the threshold for relief], even if one factor alone does not")

*Statement of the Facts*

A.    ***Dr. Chen's Declaration Analyzing Mr. Madonna's Medical Records***

  1.    ***Dr. Chen's Credentials, Experience, and Review of Mr. Madonna's Records***

As her Declaration avers, Dr. Chen is "a board-certified physician specializing in Family Medicine and Addiction Medicine, licensed to practice in the State of California and currently practicing with the Kaiser Permanente Southern California Permanente Medical Group."  Exhibit 1, at ¶ 1.

Dr. Chen's "clinical expertise is in the prevention, diagnosis, and management of chronic medical conditions and the complex interplay between physical and psychiatric diseases[,]" *id*., at ¶ 3, and her "experience in Family Medicine is primarily focused on adult medicine with significant experience in geriatric care."  *Id*.

Dr. Chen has practiced in a variety of settings, including the Los Angeles County jail.  *Id*. As she notes, she has not been compensated for her Declaration, and has reviewed Mr. Madonna's medical records and prepared he Declaration "as a volunteer."  *Id*., at ¶ 5.

Dr. Chen's Declaration is based upon her expertise, and her review of the 920 pages of Mr. Madonna's medical records – spanning a period from June 2017 through January 2025 – provided to her by counsel.  *Id*.

  2.    ***Dr. Chen's Conclusions***

███████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████





3.    *The Bases in Mr. Madonna's BOP Medical*
      *Records Supporting Dr. Chen's Conclusions*

Dr. Chen's conclusions were based on review of Mr. Madonna's voluminous BOP

medical records, which are digested below, at 15-29.











**B.**   *Mr. Madonna's BOP Medical Records Confirm the Analysis and Conclusions in Dr. Chen's Declarations, and Detail the Diverse Decline In Mr. Madonna's Health*



While at MDC, Mr. Madonna endured an extended power failure for an entire week, and

an unrelated but simultaneous failure of MDC's heating system, during the the last week of
January through the first week of February 2019, when temperatures in New York City were in
the single digits and inmates experienced appalling and unconscionable conditions, and were
deprived of the essentials of daily living:  heat, light, access to medical care (including
medication), movement or exercise, visits, and phone or other access to the outside world.[3]

      **1.**     *Dr. Jason Krellman's August 2019 Pre-Trial*
                  *Neuropsychological Examination and Report*



---

[3]  *See, e.g.,* Ginia Bellafante, "How a Brooklyn Jail Without Heat Inspired So Much Outrage," *The New York Times* (Feb. 7, 2019), available at nyti.ms/2DYFyuH;   Annie Correal, Andy Newman and Christina Goldbaum, "Protesters Try to Storm Brooklyn Jail With Little Heat or Electricity," *The New York Times* (Feb. 2, 2019), available at nyti.ms/2DRypfF;   Annie Correal and Joseph Goldstein, "'It's Cold as Hell': Inside a Brooklyn Jail's Weeklong Collapse," *The New York Times* (Feb. 9, 2019), available at nyti.ms/2E41MeL.  *See also Scott v. Quay*, 19 Civ. 1075 (MKB/LB).

[4]  Dr. Krellman's C.V., which was also provided as an Exhibit to Mr. Madonna's sentencing submission, is attached here as well as Exhibit 3.





14

██████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

   2.     *A Detailed Chronology of Mr. Madonna's Mental and Physical*
          *Deterioration Since the November 2019 Conclusion of Trial In This Case*

   █     █████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

██████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████







       b.     *2021: The Covid-19 Pandemic Continues and*
               *Mr. Madonna Is Transferred to USP McCreary*

Following sentencing, and notwithstanding the notation in the July 30, 2020, Judgment

(ECF # 1095) "[t]he Court recommends placement at a Federal Medical Center[,]" Mr.

Madonna was designated and transferred to USP McCreary in Pine Knot, Kentucky. In January

2021, Mr. Madonna's counsel wrote to the Warden at USP McCreary to alert him to the Court's

recommendation, and to request that Mr. Madonna be confined at a Federal Medical Center

("FMC"). *See* January 19, 2021, Letter from Andrew G. Patel, Esq. (a copy of which is attached

hereto as Exhibit 4). Neither the Warden nor BOP responded to that correspondence.



---

[6] The precise chronology of the *Medical Records* is at times difficult to discern because
BOP did not provide them in any chronological order.

c.     *2022:  Mr. Madonna Remains at USP McCreary*



In a November 30, 2022, email, Mr. Madonna informed counsel that the medical staff at USP McCreary concurred with him that he belonged in a medical facility, but he had not yet been transferred.  In a December 27, 2022, Request to Staff, Mr. Madonna wrote, *inter alia*,



19

his medical records concurrent with an evaluation that day: "your concerns were addressed. You are housed appropriately, and your medical condition has been addressed." *Medical Records.*, at 73.

        d.    *2023: Mr. Madonna Still Remains at USP McCreary While His Health Declines Further*







22





24



e.    *2024:  Mr. Madonna Is Finally Transferred to an FMC*



_____

<sup>10</sup> FMC's house only Care Level 4 inmates, who are classified by BOP as those who "require services available only at a BOP Medical Referral Center (MRC), which provides significantly enhanced medical services and limited inpatient care." "Care Level Classification for Medical and Mental Health Conditions or Disabilities," BOP Clinical Guidance, at 2, May 2019, available at https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf. Those inmates' "[f]unctioning may be so severely impaired as to require 24-hour skilled nursing care or nursing assistance." *Id*. Appendix I to that BOP program statement also notes that Care Level 4 inmates may have "FUNCTIONAL LIMITATIONS due to cognitive or physical impairment that prevent successful management in general population, despite appropriate assistance from an inmate companion in performing ADLs or the use of durable medical equipment." *Id*. at 8.



27



**C.    *Mr. Madonna Has Exhausted His Administrative Remedies***

As set forth in 18 U.S.C. §3582(c)(1)(A), upon a defendant's motion, a court can

entertain a motion for modification of sentence "after the defendant has fully exhausted all

administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the



.

defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

In a memo dated April 26, 2023 (a copy of which is attached as Exhibit 5), the Warden at USP McCreary, J. Gilley, responded to Mr. Madonna's request for modification of sentence "based upon concerns regarding COVID-19 and your medical concerns."  In that same memo, Warden Gilley informed Mr. Madonna that his "request is denied due to correctional concerns; specifically, █████████████."

Mr. Madonna renewed his request July 1, 2024, via a letter from Vik Pawar, Esq., of Pawar Law Group, P.C. (with which Mr. Madonna's former counsel, Robert Blossner, Esq., was affiliated).  A copy of Mr. Pawar's letter is attached hereto as Exhibit 6.  The Warden did not grant that request, either, within the 30 days allotted for decision.  *See* 18 U.S.C. §3582(c)(1)(A).

**ARGUMENT**

**POINT I**

**MR. MADONNA'S MOTION SHOULD BE GRANTED
BECAUSE HE SATISFIES THE CRITERIA SET FORTH
FOR "MEDICAL CIRCUMSTANCES OF THE DEFENDANT
ENUMERATED IN SENTENCING GUIDELINES §1B1.13(b)(1)(B)**

Dr. Chen's Declaration, and the *Medical Records* on which it is based, demonstrate that Mr. Madonna satisfies the criteria enumerated in §1B1.13(b)(1)(B) of the Sentencing Guidelines, entitled "Medical Circumstances of the Defendant." In particular, Mr. Madonna is



U.S.S.G. §1B1.13(b)(1)(B).

As discussed below, a sentence reduction based on Mr. Madonna's medical circumstances would be consistent with (a) cases generally in which defendants – including aged defendants whose ability to provide self-care is compromised – present multiple serious medical issues, even in cases involving serious criminal conduct (including homicides); and (b) the standards applied and analysis performed by this Court in adjudicating §3582 motions by Mr. Madonna's co-defendants in this case.

**A.**     ***Cases Involving Aged Defendants Suffering from Serious Medical Issues***

District Courts within the Second Circuit have often granted §3582 motions when the defendant is plagued with serious health complications, including those less grave than those of

Mr. Madonna, and/or for defendants significantly younger.[13]

For example, in *United States v. Tagliaferro*, 19 Cr. 472 (LAP), 2024 WL 5077350 (S.D.N.Y. Dec. 11, 2024), the Court reduced the sentence to time served because the defendant, who had served 50% of his 60-month sentence after conviction following trial, suffered from "hypertension," a "history of sleep apnea," and acid reflux.  2024 WL 5077350, at *2.

The Court in *Tagliaferro* also relied on the defendant's early onset cardiovascular disease, and "the persistence of Defendant's admittedly astronomical blood pressure[,]" which "demonstrates that the BOP is not adequately treating Defendant's condition."  *Id*., at *5, *citing United States v. Brady*, 18 Cr. 316 (PAC), 2021 WL 200512, at *1-2 (S.D.N.Y. Jan. 20, 2021); *Miner v. United States*, 16 Cr. 23 (PAC), 2023 WL 3222394, at *4 (S.D.N.Y. May 2, 2023) (*quoting United States v. Tirado*, 15 Cr. 487 (GBD), 2021 WL 392029, at *1 (S.D.N.Y. Feb. 4, 2021)) (motion to reduce sentence for medical condition will be granted when defendant's physical condition "can[not] be treated within the context of a correctional facility").  *See also* below, at n. 29.

Similarly, in *United States v. Tavarez*, 22 Cr. 430 (RA), 2024 WL 5004525 (S.D.N.Y. Dec. 6, 2024), the Court concluded that the defendant had established "extraordinary and compelling" reasons under §3582(c)(1)(A)(I) because the defendant was suffering from a host of medical conditions – including diabetes, hypertension, an enlarged prostate, and back pain – that "'substantially diminish[ed]' his ability to care for himself to the point that he is unable to perform many of the most rudimentary self-care tasks."  *Id*., at *2.  The Court added that "nor is

---

[13]  Cataloguing the instances in which §3582 motions have been granted on grounds similar to those Mr. Madonna presents is of course constrained by the fact that not all such decisions are reported.

[the defendant] expected to recover given that his condition is not only permanent but 'progressive.'" *Id.*

Severe and numerous medical conditions in aggregate – as in *Tagliaferro* and *Tavarez* – sufficed for a §3582 motion in *United States v. Khan,* 18 Cr. 830 (VSB), 2023 WL 2911021 (S.D.N.Y. Apr. 11, 2023). In *Khan* the conditions included chronic gastro-intestinal issues, chronic rhinitis, chronic periodontitis, iridocyclitis, high cholesterol, and possible auto-immune issues, which combined with "other factors raised" (such as lack of disciplinary sanction) warranted modification of sentence. *Id.*, at *3.

In *United States v. Ortega*, 13 Cr. 814 (JMF), 2023 WL 2752160 (S.D.N.Y. Mar. 31, 2023), the Court ruled that the defendant's rapidly progressing, incurable disorder qualified as "a serious physical or medical condition" under §1B1.13, Application Note 1(A)(ii), even when – in 2023 – the risks associated with COVID-19 were no longer present due to widespread vaccination. *Id.*, at *1.

In other Circuits, too, non-terminal medical conditions have formed the basis for modification of sentence. In *United States v. Kohler*, 15 Cr. 425 (CEH-CPT), 2022 WL 780951 (M.D. Fla. Mar. 15, 2022), the defendant, 64 years old, suffered from a "host of medical problems: obesity, pre-diabetes, hypertension, hyperlipidemia, an aortic aneurysm, chronic renal stones, an enlarged prostate, depression, likely post-traumatic stress disorder (PTSD), and a history of nearly fatal pancreatitis," all of which together "demonstrated extraordinary and compelling circumstances resulting from his serious medical conditions." *Id.*, at *3.

Courts have also cited the inadequacy of care in the BOP system in granting §3582 motions. For instance, in *United States v. Beck*, 425 F. Supp. 3d 573 (M.D.N.C. 2019), the Court

reduced the sentence of a defendant (convicted for participation in a large conspiracy to distribute methamphetamine) because of non-terminal, but invasive, breast cancer for which BOP had not provided adequate treatment. *Id*., at 581-582. *See also United States v. Robles*, 19 Cr. 4122 (LAB), 2022 WL 229362 (S.D. Cal. Jan. 26, 2022) (sentence reduced for defendant diagnosed with heart conditions, including arteriovenous malformations, and who had received inconsistent care in prison). *See also* below, at POINT II(C)) (54-78).

An inmate's ability to provide adequate self-care has also motivated courts to grant §3582 motions. *See, e.g., United States v. Morse*, 10 Cr. 20361 (DMM), 2020 WL 6534899 (S.D. Fla. Nov. 3, 2020) (defendant with chronic kidney disease, obesity, and ongoing pain management issues could not provide self-care within corrections environment).

Nor are the crimes for which Mr. Madonna was convicted – indisputably serious – disqualifying with respect to relief pursuant to §3582.[14]   Indeed, there are multiple examples within the Second Circuit in which courts have granted §3582 motions by defendants convicted of homicide – sometimes grisly, and sometimes involving multiple victims – and/or who engaged in a career of organized crime activity.

In *Minicone v. United States*, 353 F. Supp. 2d 316 (N.D.N.Y. 2005) ("*Minicone IV*"), the defendant was implicated in two specific murders and "involved in a wide-spread criminal enterprise," that engaged in criminal activity "including extortion, loansharking, illegal gambling, trafficking in stolen property and murder." *Id*., at 317 (internal quotation marks removed).   Yet the Court reduced the 72-year old defendant's sentence to time served based on

---

[14]   Related analysis in the context of the §3553(a) sentencing factors is presented below, in POINT III(A) (84-89).

his medical history, including his "sciatica, high blood pressure, and possible kidney disease," as well as his age, when taken in conjunction with the increased risk that Covid-19 presented to his health that COVID presented. *See United States v. Minicone*, 521 F. Supp. 3d 163 (N.D.N.Y. 2021).

In another organized crime case, *United States v. Russo*, 90 Cr. 1063, 2022 WL 16627450 (E.D.N.Y. Nov. 2, 2022). the defendant – a captain within the Colombo Family during a notoriously bloody "war" within that racketeering enterprise – was responsible for a double homicide: "two members of Russo's crew . . . gunned down . . . members of the Family's rival faction, at Russo's behest[.]" *Id.*

Nevertheless, the Court in *Russo* considered the defendant's medical history and risk of further health deterioration, the "harsher and more punitive incarceration" that Mr. Russo had endured because of the COVID pandemic, alongside his advanced age, as decisive factors in granting a sentence reduction. *Id.*, at *333.

A different District Judge also granted the §3582 motion of Joseph Monteleone, Mr. Russo's co-defendant, and who participated in the shooting of the two victims (and was sentenced to multiple concurrent terms of life imprisonment as a result). Citing Mr. Monteleone's serious medical conditions, including the "blood clots in his lungs," an "aortic aneurysm," and a "slew of other medical problems," and noting the fact that Mr. Monteleone was "confined to a wheelchair," the Court found that despite the fact that Mr. Monteleone "does not appear to have a terminal illness, he is clearly 'experiencing deteriorating physical health . . . because of the aging process.'" *United States v. Monteleone*, 92 Cr. 351 (ARR), 2023 WL 2857559, at *4 (E.D.N.Y. April 10, 2023).

34

Moreover, even when medical issues alone have not warranted a reduction in sentence, the presence of serious medical conditions and the risk of further deterioration, when considered alongside other factors, has provided sufficient basis for granting a §3582 motion even when the defendant had been convicted of murder or an otherwise serious crime.

Thus, in *United States v. Freeman*, 96 Cr. 527 (PKC), 2023 WL 6517466 (E.D.N.Y. Oct. 5, 2023), the defendant was serving two consecutive life sentences for narcotics trafficking, and employed "various means to protect the organization, including murder or attempted murder of rivals," yet the Court reduced the sentence because the defendant, 58 years old, suffered "from numerous chronic conditions, including hypertension . . . and [had] recently underwent hip surgery," which, combined with risk of COVID-19 infection, constituted "one of the several factors contributing to its finding that extraordinary and compelling reasons to reduce [the defendant's] sentence exist." *United States v. Freeman*, No. 96-CR-527 (PKC), 2023 WL 6517466 (E.D.N.Y. Oct. 5, 2023), *citing United States v. Snype*, F. Supp. 3d , 2023 WL 4622870, at *9 (E.D.N.Y. July 19, 2023) (granting §3582 motion because defendant's "medical situation," which was determined not so "serious" to be "extraordinary and compelling" on its own, was still "a factor to consider").

In that context, certain decisions granting §3582 motions during the Covid-19 pandemic are relevant here because they incorporated in the analysis of §1B1.13(B)(1)(b) a risk component for those inmates with underlying medical conditions that were particularly sensitive to Covid-19.[15] Here, for someone with Mr. Madonna's medical profile, including his age, the heightened

---

[15] Those cases addressed the 2018 Amendment (813) to the Guidelines, and not the later November, 2023 Amendment (814) passed as the pandemic waned.

risk of damage – perhaps fatal – from certain conditions and diseases that circulate routinely within prison populations, that risk assessment applies well beyond Covid-19, and extends to myriad circumstances within prison generally, and within BOP specifically.

For example, in *United States v. Quinones*, 00 CR. 761-1 (JSR), 2021 WL 797835 (S.D.N.Y. Feb. 27, 2021), the Court granted a §3582 motion for a defendant convicted of murder after a capital trial (but sentenced to life imprisonment without parole) because his underlying health conditions placed him at high risk of severe illness if he contracted Covid-19. *Id*., at *2. *See also United States v. Rodriguez*, 00 Cr. 761 (JSR) 2020 WL 5810161 (S.D.N.Y. Sept. 30, 2020) (for same reason, sentence reduced for co-defendant in *Quinones*); *United States v. Phillips*, 469 F. Supp.3d 180, 183 (S.D.N.Y. 2020) (same for defendant in another case convicted of racketeering conspiracy, possession of a firearm in relation to a crime of violence, and conspiracy to assault with a dangerous weapon); below, at POINT III(A) (84-89).

Here, as detailed above, at 4-10, 15-29, Mr. Madonna's multiple serious, deteriorating, and in some respects incurable, medical conditions, in tandem with his advanced age, eclipse even the most compelling set of medical issues presented in the cases digested above in which courts have granted §3582 motions.

Also, as in some of those cases, BOP is not capable of providing the necessary level of care.

36

2.     *The Court's Approach and Decisions Regarding*
       *§3582 Motions Filed By Mr. Madonna's Co-Defendants*

Several of Mr. Madonna's co-defendants have filed motions pursuant to §3582(c)(1)(A). As discussed below, while the Court has granted one motion – that by Joseph Datello, *see* Order, January 10, 2023 (ECF # 1276) – granting Mr. Madonna's motion herein would be consistent with the analysis the Court has performed in deciding the motions filed by Mr. Madonna's co-defendants.

While in Mr. Datello's case, the government made the motion (ECF #1275) that was granted – although Mr. Datello's counsel had made similar motions and had kept the Court advised of Mr. Datello's deteriorating condition – in many respects Mr. Madonna presents a more compelling case for relief.[16]

For example, Mr. Datello was 71 years old at the time – nearly 20 years younger than Mr. Madonna is now.  *See* ECF # 1276.  Mr. Datello had been in custody four approximately four years;  Mr. Madonna has served close to ten years.  ███████████████████

█████████████████████████████████████████████████████

████████████████████████████ ██████████████████████

███████████████████████████████████████████

██████████████████████████████████

Regarding Mr. Madonna's other co-defendants who have moved pursuant to

---

[16]  In *United States v. Griffin*, 22 Cr. 408 (EK), 2024 WL 2891686 (E.D.N.Y. June 10, 2024), the Court commented that "as other courts have observed, the Bureau of Prisons has generally declined to bring compassionate release motions on the basis of inadequate medical care, including during the height of the COVID-19 pandemic."  *Id.*, at *4-5, *citing United States v. Johnson*, 671 F. Supp.3d 271, 274-76 (E.D.N.Y. 2023) (collecting cases).

§3582(c)(1)(A), their applications – nearly all of which were filed at or near the outset of the

Covid-19 pandemic, and were based on the threat the virus posed to them – were resolved as

follows:

- Richard O'Connor's initial motion was denied because he had failed to exhaust

  his administrative remedies.  *See* ECF # 990, April 10, 2020.  Shortly thereafter,

  this Court addressed the merits, and denied the motion, which was based

  primarily on the threat Covid-19 posed to inmates, on the merits, noting that BOP

  had "taken substantial steps to protect its inmates[]" from Covid-19, and that the

  number of active cases of Covid-19 at Mr. O'Connor's institution at the time was

  small.  *See* ECF

  # 992, April 13, 2020;

- Joseph Venice's motion was denied without prejudice because he, too, had failed

  to exhaust his administrative remedies.  *See* ECF # 994, April 14, 2020;

- Tindaro Corso's motion was denied May 10, 2020.  *See* ECF # 1014.  Mr. Corso,

  59 years old at the time, had served fewer than eight months of his sentence, and

  his medical conditions did "not appear to correspond to the Covid-19 risk

  factors."  *Id*.  In addition, there were not any Covid-19 cases at FCI Fort Dix

  (where Mr. Corso was confined), but only at the adjacent camp.  *Id*.;

- Brian Vaughan's motion was denied May 13, 2020 (ECF # 1021), in part because

  his orthopedic issues did "not appear on the [Center for Disease Control]'s list of

  factors that put individuals at risk for severe illness[]" from Covid-19.  *Id*.  Also,

  Mr. Vaughan's diabetes was sufficiently mild that it was being treated with

38

medication, and not insulin.  *Id*.;

- John Castelucci's motion was denied May 30, 2020 (ECF # 1039).  While the Court assumed Mr. Castelucci's medical conditions constituted "extraordinary and compelling circumstances," he, too, was confined at FCI Fort Dix, and not the FPC at which the Covid-19 cases were present.  *Id*.  Also, Mr. Castelucci had served only nine months of his sentence, and was potentially within nine months of placement in a halfway house.  *Id*.  Moreover, Mr. Castelucci's criminal record included eight convictions, five of which were for felonies, three of which were in federal court – with this case constituting his second conviction pursuant to the Racketeer Influenced and Corrupt Organizations Act.  In evaluating the §3553(a) factors, the Court concluded "there is no reason to believe [Mr. Castelucci] will not commit further crimes."  *Id*.;

- James Maffucci's motion was denied June 13, 2020 (ECF # 1050).  While the Court assumed Mr. Maffucci's medical issues satisfied the standard for "extraordinary and compelling circumstances," he had served only "half of his 37-month sentence[,]" and the Court concluded "[t]here is no reason to believe Defendant would now eschew his sworn loyalty to the Lucchese Family of La Cosa Nostra if the remainder of his prison term were eliminated."  *Id*.  The Court further pointed out that Mr. Maffucci's "health issues predated his arrest in this case and did not prevent him from committing extortion and loansharking as part of the Lucchese Family."  *Id*.;

- Joseph DiNapoli has made two motions, both of which were denied.  *See* ECF

39

# 1026, May 18, 2020, and ECF # 1266, May 19, 2022.  Regarding Mr. DiNapoli's initial (2020) motion, the Court noted Mr. DiNapoli had served only three months of his sentence at that point, that he had ten convictions, five of which were in federal court, and that the §3553(a) factors "weigh heavily against release."  ECF # 1026.  Indeed, the Court concluded that, if released, Mr. DiNapoli would "revert to criminal activity."  *Id*.

Regarding Mr. DiNapoli's subsequent motion two years later, he had served 27 months (past the halfway point), and had been transferred to an FMC.  ECF # 1266.  However, Mr. DiNapoli did "not claim to be receiving inadequate care."  Nor were there any active Covid-19 cases at FMC Devens, where Mr. DiNapoli was incarcerated.  Thus, even while assuming the presence of "extraordinary and compelling circumstances," the Court determined "they are outweighed by the §3553(a) factors."  *Id*.

Here, as detailed above, Mr. Madonna's medical circumstances are considerably more serious and his conditions more advanced than his co-defendants' – except perhaps for Mr. Datello, who ultimately was released pursuant to a §3582 motion.  Also, Mr. Madonna's age places him in substantially more jeopardy than his co-defendants, ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████  Another distinguishing factor is that the medical care Mr. Madonna has received while in BOP custody has indeed been inadequate, and continues to place him in jeopardy.

In Mr. Datello's case, two years prior to granting the government's motion, the Court

pointed out that it is not the province of the federal courts to "micromanage" BOP's provision of medical care. *See* ECF #1171. Yet, as Mr. Madonna's condition continues to deteriorate, he will lack any alternative other than to petition the Court for intervention. Thus, granting Mr. Madonna's motion will conserve not only BOP's resources, but those of the Court as well.

**POINT II**

**SEVERAL ADDITIONAL CONSIDERATIONS
JUSTIFY GRANTING MR. MADONNA'S MOTION**

In addition to his medical condition, several additional factors discussed below justify modification of Mr. Madonna's sentence, and, considered together, either constitute "extraordinary and compelling circumstances," or provide substantial support for modificsation based on Mr. Madonna's medical circumstances.

A.      *Mr. Madonna Was Incarcerated Through the Entirety of the Covid-19 Pandemic, and Has Manifested the Symptoms of "Long Covid," Which BOP Does Not Treat*

Mr. Madonna was incarcerated through the full trajectory of the Covid-19 pandemic

████████████████████████████████████████████████████

████████████  While Covid-19 has receded in the collective consciousness, its impact on inmates – especially those who suffered from it directly – cannot be underestimated, and endures today.

In granting motions to modify sentences (pursuant to 18 U.S.C. §3582(c)(1)(A)) for three defendants in a well-known terrorism prosecution, Judge McMahon reflected on the impact of Covid-19 on incarcerated individuals. While noting that by 2023 Covid-19 was "far from the dreaded killer that arrived on our shores in 2020[,]" Judge McMahon nevertheless acknowledged that "what is true on a going forward basis is not necessarily true when looking back." *United*

41

*States v. Williams*, No. 09 Cr. 558 (CM), 2023 WL 4785286, at *12 (S.D.N.Y. July 27, 2023).

In the companion case, *United States v. Cromitie*, 09 Cr. 558 (CM), 2024 WL 216540 (S.D.N.Y. January 19, 2024), Judge McMahon recognized that

> the pandemic was extremely hard on prisoners. The necessary steps that the BOP undertook to stop the spread of the deadly virus – lockdowns, suspension of programs, and curtailed visitation – led to increased prisoner isolation and fewer program opportunities for inmates. This created harsher than usual conditions of confinement, which is a factor the court can and does consider in deciding whether extraordinary and compelling circumstances warrant granting compassionate release for a COVID-19 era inmate.

*Id*., at *8. *See also Williams*, 2023 WL 4785286, at *12.

During the pandemic, Judge Engelmayer – as Judge McMahon did subsequently in *Williams* and *Cromitie*, discussed above – applied the same rationale. *See United States v. Lizardi*, 11 Cr. 1032 (PAE) (S.D.N.Y. Oct. 9, 2020), at 7 (ECF # 2523) ("[a] day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing"). *See also United States v. Russo*, 2022 WL 17247005, at *3 (E.D.N.Y. November 28, 2022) ("arguments [for compassionate release] may also interact with the present coronavirus pandemic, which courts around the country, including in this district, have used as a justification for granting some sentence reductions").[17]

---

[17] Of course, courts routinely recognized the adverse impact of the pandemic in the initial context of sentencing. *See, e.g., United States v. Romero*, 15 Cr. 445-18 (PAE), 2021 WL 1518622, at *4 (S.D.N.Y. Apr. 16, 2021) ("[a] day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. Although not intended as punishment, incarceration in such conditions

In *Russo*, the Court listed some of the specific measures that made incarceration so onerous during the pandemic, including the "nearly 24-hour lockdowns [that were] repeatedly imposed for long stretches to prevent the spread of COVID-19[,]" as well as the absence of any visitation for extended periods, including the first year of the pandemic" (which, in Mr Madonna's case, was while he was still accessible to his family).  2022 WL 16627450, at *5.

The protocols necessary to control Covid-19 within BOP facilities, "while aimed at protecting inmates from illness, also have an indisputably punitive effect." *Id*.  Thus, in *Russo* the Court concluded that "while this factor may not independently constitute an extraordinary or compelling reason, it weighs towards a sentence reduction." *See also United States v. Monteleone*, 2023 WL 2857559, at *4 (while acknowledging "the pandemic no longer poses the same threat as it did prior to the availability of vaccines," the Court nonetheless found "extraordinary and compelling" reasons warranting a reduction in sentence because of defendant's deteriorating conditions).

The arc of the pandemic demonstrated that prisons, and U.S. federal prisons in particular, were insufficiently equipped – in terms of medical and logistical resources, funding, policy, and commitment – to address the increased exposure and infection rates that the prison climate presented.  *See,* e.g., GAO-21-502, "BOP Could Further Enhance its COVID-19 Response by Capturing and Incorporating Lessons Learned" U.S. General Accounting Office (July 2021), available at bit.ly/3fYCxx4.  *See also* "Bureau of Prisons: Opportunities Exist to Better Analyze Staffing Data and Improve Employee Wellness Programs," U.S. Government

---

is, unavoidably, more punishing"), *citing United States v. Rodriguez*,  00 Cr. 761 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020);  *United States v. Ng Lap Seng*, 15 Cr. 706 (VSB), 2021 WL 961749, at *6 (S.D.N.Y. Mar. 15, 2021) (same).

Accountability Office (Feb. 2021), available at bit.ly/3rH8ekx (highlighting that insufficient staffing exerts an adverse impact on inmate access to programming, medical and dental care).

Here, in addition to the debilitating and continuing effects of the virus itself, Mr. Madonna suffered through all the restrictions, isolation, tension, and fear that the Covid-19 pandemic wrought in prisons throughout its entire course. Even though Covid-19 is no longer a current factor in the conditions of detention, it is respectfully submitted that not accounting for the extended time Mr. Madonna did spend in that environment would represent an unwarranted disparity considering both the routine reduction of sentences in 2020 through 2023 for defendants who suffered incarceration through the Covid-19 pandemic, and the modifications of previously imposed sentences for the same reason.

Also, in *United States v. Rodriguez*, 492 F. Supp. 3d 306 (S.D.N.Y. 2020), Judge Rakoff rebutted any claim that the impact of the Covid-19 pandemic upon inmates "would diminish in importance once the pandemic was over[,]" pointing out "this is not entirely so[]" because the conditions attendant to the pandemic, aside from the considerable threat to inmates' health, it "made [an inmate's] incarceration harsher and more punitive than would otherwise have been the case." *Id.*, at 311. *See also Russo*, 2022 WL 16627450, at *5.

**B.    *Mr. Madonna Has Since* ███████████████████ *Manifested Multiple Symptoms of "Long Covid," Which BOP Neither Recognizes Nor Treats***

The Covid-19 pandemic generated not only an overwhelming number of Covid-19 infections, but also a phenomenon commonly described as "Long Covid." ███████████ ██████████████████ – before the term "Long Covid" was even coined, or the syndrome discussed in the public domain – Mr. Madonna has exhibited, and complained of, the defining symptoms of Long Covid: fatigue, memory lapses, vision impairment, among others.

*See e.g.*, above, at 20, 25, 27-28.

### 1.    *Long Covid Is Now Recognized and Defined*

Currently, five years after the advent of the pandemic, working definitions of Long Covid

have emerged.  For example, the National Academies of Sciences, Engineering, and Medicine

("NASEM"), defines Long Covid as

> an infection-associated chronic condition (IACC) that occurs after
> SARS-CoV-2 infection and is present for at least 3 months as a
> continuous, relapsing and remitting, or progressive disease state
> that affects one or more organ systems.

NASEM, *A Long COVID Definition: A Chronic, Systemic Disease State with Profound*

*Consequences*, 2024, Washington, DC: The National Academies Press, at 2-3 (Box S-1) ("*A*

*Long COVID Definition*"), available at https://doi.org/10.17226/27768.

An earlier 2024 NASEM report classified Long Covid as follows:

> Long COVID is associated with a wide range of new or worsening
> health conditions and encompasses more than 200 symptoms
> involving nearly every organ system.

NASEM, *Long-Term Health Effects of COVID-19: Disability and Function Following*

*SARS-CoV-2 Infection*, 2024, Washington, DC: The National Academies Press, at 5 ("*Long Term*

*Health Effects*:), available at https://doi.org/10.17226/27756.

A 2024 article in *Nature Medicine* provided a similar and more detailed description:

> Long COVID is a complex, multisystem disorder that affects
> nearlyevery organ system, including the cardiovascular system[],
> the nervous system[], the endocrine system[], the immune
> system[], the reproductive system[] and the gastrointestinal
> system[].

Aly, Z., Davis, H., McCorkell, L. *et al. Long COVID science, research and policy*, Nat Med 30,

2148-2164, August 9, 2024 ("*Long COVID Science*"), at 2148 (footnotes omitted), available at

https://doi.org/10.1038/s41591-024-03173-6.

2.    *The Litany of Symptoms Associated with Long Covid* ████████████████████

Long Covid "affects people across the age spectrum (from children16–18 to older

adults[]), people of different race and ethnicities, sex and gender, and baseline health status[]."

*Id*. (footnotes omitted).  Symptoms of Long Covid are manifold.  In fact, its

> [c]ardinal manifestations include brain fog (or cognitive
> dysfunction)[], fatigue, dysautonomia (which commonly manifests
> as postural orthostatic tachycardia syndrome (POTS))[] and
> post-exertional malaise[].

*Id*. (footnotes omitted).  *See also Long Covid Definition*, at 2-3 (Box S-1) (Long Covid

"manifests in multiple ways.  A complete enumeration of possible signs, symptoms, and

diagnosable conditions of LC would have hundreds of entries.  Any organ system can be

involved, . . .").[18]

Specific symptoms include "shortness of breath, cough, persistent fatigue, post-exertional

malaise, difficulty concentrating, memory changes, recurring headache, lightheadedness, fast

heart rate, sleep disturbance, problems with taste or smell, bloating, constipation, and diarrhea."

*Long Covid Definition*, at 2-3 (Box S-1).  *See also* Op-Ed, Georgia Lupi, "1,374 Days – My life

with long Covid," *The New York Times*, December 14, 2023, available at

https://nyti.ms/3RN65R

o (author describes her "new reality[,]" in which "I fully come into consciousness, I feel dizzy,

faint and nauseated.  Pain pulses throughout my body, and my limbs feel simultaneously as

---

[18]  In that context, "[m]any of the health effects seen in long COVID are shared across several infection-associated chronic conditions, also called post-acute infection syndromes[]." *Long Covid Science*, at 2148 (footnote omitted).

46

heavy as concrete and weak as jelly.  It feels as if a machine were squeezing my skull, and extreme exhaustion overtakes me").

In addition, "some manifestations of long COVID, including heart disease, diabetes, myalgic encephalomyelitis and dysautonomia are chronic conditions that last a lifetime . . ." *Long Covid Science*, at 2149 (footnotes omitted).  *See also* Adam Gaffney, "What Doctors Still Don't Understand About Long COVID," *The Atlantic*, October 5, 2022, available at bit.ly/3Mph9QG ("[e]ven mild COVID-19 is at least correlated with a startlingly wide spectrum of seemingly every illness.  Quite simply, long COVID isn't any one thing").

### 3.   *Specific Aspects of Long Covid Vulnerability and Severity* █████████████████████████████

While many aspects of Long Covid remain the subject of research and investigation, certain facets of Long Covid have been identified – ███████████████████████.  For example, "[t]he risk of Long COVID increases with the severity of acute infection."  *Long Term Health Effects*, at 7.  Also, according to the NASEM committee's "best estimate, people whose infection was sufficiently severe to necessitate hospitalization are 2-3 times more likely to experience Long COVID than are those who were not hospitalized, and among those who were hospitalized, individuals requiring life support in the intensive care unit may be twice as likely to experience Long COVID."  *Id*.  *See also Long Science*, at 2148.

In addition, Long Covid "can follow asymptomatic, mild, or severe SARS-CoV-2 infection[,]" and "can exacerbate pre-existing health conditions or present as new conditions." *Long Covid Definition*, at 2-3 (Box S-1).  The number of infections also has an impact, as "[c]umulatively, two infections yield a higher risk of long COVID than one infection and three infections yield a higher risk than two infections[]."  *Long Covid Science*, at 2148 (footnotes

omitted).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████

Moreover, "[t]he greatest deficits in cognitive function were associated with the original strain of the virus (before December 1, 2020) . . .[,]" █████████████████████████

█████████████████████ "Long Covid and Impaired Cognition – More Evidence and More Work to Do," Ziyad Al-Aly, M.D., and Clifford J. Rosen, M.D., February 28, 2024 *N Engl J Med* Vol. 390, 858-860, at 859 ("*Impaired Cognition*"), available at 10.1056/NEJMe2400189, *citing* A. Hampshire, A. Azor, C. Atchison, et al., "Cognition and Memory after Covid-19 in a Large Community Sample," February 29, 2024, *N Engl J Med*, Vol. 390, 806-18 ("*Cognition and Memory After Covid-19*"), available at  10.1056/NEJMoa2311330.

4.      ***Studies Have Established the Cognitive Damage from Long Covid***

In fact, research has to some extent quantified the cognitive damage from Long Covid. As pointed out in *Impaired Cognition*, "[m]emory, reasoning, and executive function (*i.e.*, planning) tasks were the most sensitive indicators of impaired function, and scores on these tasks tended to correlate with brain fog."  *Impaired Cognition*, at 860.  *See also* Pam Belluck, "Long Covid May Lead to Measurable Cognitive Decline, Study Finds," *The New York Times*, February 28, 2024 ("*Measurable Cognitive Decline*"), available at https://nyti.ms/45xhvA4 ("Long Covid may lead to measurable cognitive decline, especially in the ability to remember, reason and plan,

a large new study [*Cognition and Memory After Covid-19*] suggests").[19]

Indeed, the diminution in IQ has been measurable, and tiered depending on specific factors. For instance, "those with persistent post-Covid symptoms scored the equivalent of 6 I.Q. points lower than people who had never been infected with the coronavirus, according to" *Cognition and Memory After Covid-19*. *Measurable Cognitive Decline*. Even "[p]eople who had been infected and no longer had symptoms also scored slightly lower than people who had never been infected, by the equivalent of 3 I.Q. points, even if they were ill for only a short time." *Id*. *See also Impaired Cognition*, at 858-59.

More serious cases, ███████████ augured additional cognitive loss: "[t]hose who had been admitted to the intensive care unit had the equivalent of a 9-point loss in IQ." *Impaired Cognition*, at 859. Nor did vaccines stem this tide, as they "provided a small cognitive advantage." *Id*., at 860. ███████████████ "[r]einfection contributed an additional loss in IQ of nearly 2 points, as compared with no reinfection." *Id*.[20]

_____

[19]  *See also See, e.g.*, Wes Ely, "How long covid reshapes the brain – and how we might treat it," *The Washington Post*, August 25, 2022, available at wapo.st/3SPnbMT ("[e]arlier this year, the UK Biobank neuroimaging study showed that even mild covid can lead to an overall reduction in the size of the brain, with notable effects in the frontal cortex and limbic system. These findings help explain the profound anxiety, depression, memory loss and cognitive impairment experienced by so many long-covid patients");  Maxime Taquet, Rebecca Sillett, Lena Zhu, Jacob Mendel, Isabella Camplisson, Quentin Dercon, Paul J Harrison, "Neurological and psychiatric risk trajectories after SARS-CoV-2 infection:  an analysis of 2-year retrospective cohort studies including 1,284,437 patients," *The Lancet*, August 17, 2022, available at bit.ly/3MjmXuW ("COVID-19 is associated with increased risks of neurological and psychiatric sequelae in the weeks and months thereafter").

[20]  *See also* Research Square, "Post-COVID cognitive deficits at one year are global and associated with elevated brain injury markers and grey matter volume reduction: national prospective study," January 5, 2024, at xvi, available at https://doi.org/10.21203/rs.3.rs-381858 0/v1 (report "prepared with a sense of urgency in light of the rapid evolution of knowledge about the diagnosis of SARS-CoV-2 infection and the long-term health effects and

**5.**    ***Long Covid Is Not Subject to a Diagnostic Test, and a Recognized Course of Treatment Does Not Yet Exist***

Notwithstanding these advances, specific, reliable means of diagnosis and treatment have thus far eluded clinicians.  *Long Covid Definition* confirms that "[n]o well-documented, pathophysiological cascade nor any sufficiently discriminating biomarker can today definitively diagnose Long COVID."  *Long Covid Definition*, at xvii (Preface).  *See also id*., at 2-3 (Box S-1) (Long Covid "can be diagnosed on clinical grounds[]" because "[n]o biomarker currently available demonstrates conclusively the presence of" Long Covid).[21]

In reporting on *Long Covid Science*, *The New York Times* noted that "[t]here is still too little known about treating long Covid, the authors wrote, and there remains a 'near-total absence of evidence from randomized clinical trials to guide treatment decisions.'"  Pam Belluck, "About 400 Million People Worldwide Have Had Long Covid, Researchers Say," *The New York Times*, August 9, 2024 ("*400 Million People*"), available at https://bit.ly/4kDkFqd.[22]

---

disordered function that may follow COVID-19, . . .").

[21]  *See also Long-Term Health Effects*, at 5 ("[t]here currently are no consensus-based diagnostic criteria for the condition;  criteria for diagnosis are evolving as experience and research findings develop");  Pam Belluck, "Scientists Offer a New Explanation for Long Covid," *The New York Times*, October 16, 2023, available at https://bit.ly/45zFKO1. (Long Covid is "a condition that takes many forms and often does not register on standard diagnostic tools like X-rays").

[22]  Regarding the prevalence of Long Covid, according to *The New York Times* article, *Long Covid Science* "suggested that the actual number might be higher [than 400 million globally] because their estimate included only people who developed long Covid after they had symptoms during the infectious stage of the virus, and it did not include people who had more than one Covid infection."  *400 Million People*.  *See also Long Covid Definition*, at 1 ("some estimates of the percentage of those infected with COVID-19 who develop Long COVID range from 10 to 35 percent or higher");  Francesca Paris, "Can't Think, Can't Remember:  More Americans Say They're in a Cognitive Fog," *The New York Times*, November 13, 2023, available at https://www.nytimes.com/2023/11/13/upshot/long-covid-disability.html.

Other obstacles exist as well: "Worldwide, the researchers said, patient care is hampered by overburdened health systems and *a lack of knowledge by medical professionals, some of whom erroneously consider the symptoms to be psychosomatic*." *Id.* (emphasis added). Thus, "[t]here currently is no curative treatment for Long COVID itself." *Long-Term Health Effects*, at 10.

Long Covid is also enduring, as *Long Covid Science* "cited studies suggesting that only 7 percent to 10 percent of long Covid patients fully recovered two years after developing long Covid." *400 Million People*. *See also Long Covid Definition*, at xvii ("[w]hile most people infected with SARS-CoV-2 fully recover, tens of millions worldwide experience persistent symptoms and organ damage as well as other consequences for months to years after acute infection").

As a result, "[m]anagement of the condition is based on current knowledge about treating the associated health effects and other sequelae." *Id.* In turn, "[a]s with other complex multisystem chronic conditions, treatment focuses on symptom management and optimization of function and quality of life." *Id.*

**6.    *Long Covid Exacts a Significant Physical and Psychological Toll***

That "quality of life" is often significantly compromised for those suffering from Long Covid. *Long Covid Definition* describes Long Covid as a "complex and lingering disease state" with "profound medical, social, and economic consequences worldwide," *id.*, at 1, that

> can impair individuals' ability to work, attend school, take care of family, and care for themselves. It can have a profound emotional and physical impact on patients and their families and caregivers.

*Id.*, at 2-3 (Box S-1).

51

*Long Covid Science* adds that Long Covid

> drastically affects patients' well-being and sense of self, as well as their ability to work, socialize, care for others, manage chores and engage in community activities – which also affects patients' families, caregivers and their communities.

*Long Covid Science*, at 1252 (footnote omitted).

Indeed, "[o]ver three quarters of people with long COVID report a moderate or severe impact on general well-being[]." *Id*. (footnote omitted).  In addition, "[t]he high rates of cognitive and physical symptoms also affect individuals' identity and sense of self." *Id*.  As a result, "[m]any patients with long COVID experience social exclusion, isolation and stigma, often from medical providers[]." *Id*. (footnotes omitted).[23]

The absence of any diagnostic certainty and/or proven treatment regimens also produces anxiety, depression, and disorientation because "patients can remain unacknowledged, in a kind of diagnostic limbo." *Long Covid Definition*, at xvii.  That further alienates Long Covid sufferers because many – even among medical professionals – unfamiliar with Long Covid neither recognize its symptoms nor acknowledge its existence.

Commenting on *Impaired Cognition,* "James C. Jackson, a neuropsychologist at Vanderbilt Medical Center, who was not involved in the study[,]" explained that "'[t]hese

---

[23]  *See also* Marla Berg-Weger, Thomas Cudjoe, Yingying Lyu, "Addressing the Impact of COVID-19 on Social Isolation and Loneliness," *National Academies of Sciences, Engineering, Medicine*, 2024, at 2, available at http://nap.nationalacademies.org/27874 ("COVID-19 pandemic has significantly impacted mental health by heightening social isolation and loneliness across various demographics, raising concerns for public health and individual and societal well-being") (citations omitted).  Again pertinent to Mr. Madonna's circumstances, "[t]he impact of COVID-19 was both immediate and long-term:  the initial surge of loneliness and social isolation was due to the *lockdowns, quarantines, and widespread fear of the virus*, while extended adaptations and further effects are still unfolding." *Id*. (emphasis added).

emerging and coalescing findings are generally highlighting that yes, there is cognitive impairment in long Covid survivors – it's a real phenomenon[.]'" *Measurable Cognitive Decline*. *See also id*. (Dr. Jackson added that *Impaired Cognition* should also ""validate many people with long Covid whose cognitive complaints have been dismissed"); Zeynep Tufekci, "If You're Suffering After Being Sick With Covid, It's Not Just in Your Head," *The New York Times*, Aug. 25, 2022, available at nyti.ms/3TaS0LD ("[t]o add to their misery – despite centuries of evidence that viral infections can lead later to terrible debilitating conditions – their travails are often dismissed as fantasy or as unworthy of serious concern").

Of course, all of those difficulties those with Long Covid encounter – lack of a diagnostic mechanism, lack of standardized treatment protocols, and lack of recognition of the condition – are compounded and aggravated in the prison environment. Here, the *Medical Records* establish that BOP medical staff either misinterpreted or disbelieved Mr. Madonna's continued description of maladies as "complaints" rather than as classic symptoms of Long Covid.

Also, medical staff chose to "assume increasing frailty" due to Mr. Madonna's age rather than investigate his symptoms. *See* Victoria Mansell, Sally Hall Dykgraaf, Michael Kidd, and Felicity Goodyear-Smith, "Long COVID and older people," National Institutes of Health, National Library of Medicine (reprinted from *Lancet Healthy Longev*., 2022 Dec;3(12):e849-e854, available at https://pubmed.ncbi.nlm.nih.gov/36480981/.

Neither resources nor commitment exist within BOP to address Long Covid at any of the critical stages – diagnosis, treatment, or recognition. Thus, even more so than in the general population, in prisons Long Covid – and the suffering of those, including Mr. Madonna, afflicted

by it – is ignored.

**C.    *BOP Is Not Capable of Providing Mr. Madonna an Appropriate Level of Care***

BOP's inability to provide Mr. Madonna adequate medical care is not an isolated

problem within the BOP system.  Rather, as set forth below, it is emblematic of the manifold

crises BOP confronts at a critical juncture – when its career leadership has departed, when its

staff shortages worsen (and its personnel are demoralized), when its infrastructure crumbles, and

when resources necessary to address those issues are not simply underfunded, but diminished.

A March 2022 Department of Justice Office of Inspector General ("DOJ OIG") audit of

BOP's contract with the University of Massachusetts Chan Medical School, "which provides

some of the medical services at [FMC] Butner[,]" *id.*, concluded that BOP "did not have a

reliable, consistent process in place to evaluate timeliness or quality of inmate healthcare."  U.S.

Dep't of Justice, No. 22-052, *Audit of the Federal Bureau of Prisons Comprehensive Medical

Services Contracts Awarded to the University of Massachusetts Medical School* (March 2022)

(*UMass Audit*), available at https://oig.justice.gov/sites/default/files/reports

/22-052.pdf.

The *UMass Audit* further cited "challenges in transporting inmates to off-site

appointments which resulted in a frequent need to reschedule appointments that could delay an

inmate's healthcare."  *Id.*, at 13.  Those performing the audit informed the DOJ OIG that a

"significant amount of time" was devoted to canceling and rescheduling inmate medical

appointments outside the facility.  Consequently, the audit stated "it is difficult for the BOP to

determine whether inmates are receiving care within the required community standard."  *Id.*, at

14.

54

The result is a continuing and growing threat to the health and safety of inmates and staff. Nor does the horizon forecast improvement.  Instead, BOP's problems are deepening and accelerating.

In May 2024, concurrent with the release of a report detailing the problems at FCI Sheridan (Oregon), DOJ Inspector General ("DOJ IG") Michael E. Horowitz sat for separate interviews with news media.  In one, he told *National Public Radio* ("*NPR* ") that BOP's staffing problems are

> at least 20 years in the making.  It's not going to get fixed
> overnight.  But what these inspections show us how serious the
> problem has now become[.] . . .  It is deeply concerning when you
> go to a facility like Sheridan and you hear from the staff,
> correctional officers, health care workers, educators, that they
> can't do the jobs that they're there to do and they want to do.

Jaclyn Diaz, "Lack of staffing led to 'deeply concerning' conditions at federal prison in Oregon," *NPR*, May 22, 2024 ("*Deeply Concerning*"), available at https://bit.ly/418OMh4.

Earlier, in his February 28, 2024, prepared statement accompanying his testimony before the Senate Judiciary Committee, DOJ IG Horowitz pointed out that, before turning to the principal subject of his testimony (a February 2024 report on deaths in BOP custody),

> it is important to put [the report's] findings into a broader context,
> and to emphasize the recurring, chronic nature of many of the
> issues we identified.  I have been the Inspector General at the
> Justice Department for almost 12 years, and every year I have
> included the BOP in my annual report of the top management and
> performance challenges facing the Department.  Yet, with some
> notable exceptions, *the problems at the BOP have generally
> increased over the years*.

*Examining and Preventing Deaths of Incarcerated Individuals in Federal Prisons Before the Senate Committee on the Judiciary*, 118th Cong. (2024) (prepared statement of Michael E.

Horowitz, Inspector General of the U.S. Department of Justice, at 2) (emphasis added).[24]

Even then-BOP Director Colette Peters, testifying at the same hearing, acknowledged that BOP is in "crisis" in multiple respects.  *See Examining and Preventing Deaths* (testimony of Colette S. Peters, Director of the Federal Bureau of Prisons), available at https://bit.ly/4cowpbV. *See also* Jamiles Lartey and Christie Thompson, "How Federal Prisons Are Getting Worse," *The Marshall Project*, March 2, 2024, available at https://bit.ly/4cCdRpU ("[o]n Wednesday [February 27. 2024], federal prisons' director Colette Peters once again found herself facing tough questions over an agency in crisis").[25]

1.    *BOP Medical Facilities Are Suffering Staff Deficits That Adversely Affect the Level of Care Provided to Older Inmates*

The delivery of medical care to inmates is integral to BOP's mission and responsibilities, yet it suffers from the same material flaws as BOP in general:  lack of sufficient staff, lack of sufficient funding for medicine and supplies, and intolerable delays in treatment, including outside consultations and surgeries.

In addition, as detailed below, in section II(C)(1)(c) (64-69), ████████████████████ ████████ a DOJ OIG report released just last month establishes that BOP is woefully deficient in screening for colorectal cancer, for following up such screenings, and for performing colonoscopies for patients requiring them.

a.    *The DOJ OIG's December 2024 Report Regarding FMC Devens*

---

[24] The report is *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions*, DOJ OIG, No. 24-041, February 2024, at 1-2, 10-11, 18, available at https://bit.ly/4fHHM1q.

[25] The "crisis" admission was made during then-Director Peters's live testimony under oath to the Senate Judiciary Committee.  *See id*, available at https://bit.ly/3YFf7Uo.

Even FMC's appear subject to the same deficiencies.  In December 2024, the DOJ OIG

issued a report with respect to FMC Devens.  *See* DOJ OIG, *Inspection of the Federal Bureau of*

*Prisons' Federal Medical Center Devens*, No. 25-009, December 2024, Evaluations and

Inspections Division ("*2024 FMC Devens Report*"), available at

https://oig.justice.gov/reports/in

spection-federal-bureau-prisons-federal-medical-center-devens.

> As the *2024 FMC Devens Report* states,

>> [n]otably, substantial shortages of healthcare employees and
>> Correctional Officers – which is an issue at many BOP institutions
>> but particularly problematic for a medical institution – have
>> created widespread and troubling operational challenges at FMC
>> Devens that substantially affect the health, welfare, and safety of
>> employees and inmates.

*Id*., at i.

Astonishingly (and troubling), according to the *2024 FMC Devens Report*, "during the

on-site portion of our inspection and shortly thereafter, the medical institution had only 1

physician and the Clinical Director (who is also a physician) to manage the care of the *entire*

*inmate population of approximately 941 inmates*: 2 of the institution's 6 physicians were on

extended leave without pay, and 3 other physician positions were vacant."  *Id*. (emphasis added).

In addition, the "Clinical Director, who leads the provision of preventive health services

and provides standing orders for nurses, retired in June 2024;  the position remained vacant as of

October 5, leaving FMC Devens without this critical medical role filled and *only one physician*

*at the institution to provide daily patient care*."  *Id*., at i (emphasis added).

Also, FMC Devens's staffing problem extended to its appreciation of its needs:  DOJ

OIG's "inspection of FMC Devens found significant staffing shortages at the institution, as well

57

as substantial disparities in BOP estimates of the staffing levels necessary for the institution to execute its missions successfully." *Id*., at 7.

Consequently, the *2024 FMC Devens Report* concluded that "FMC Devens's Health Services Department is in a staffing crisis." *Id*., at 11. The numbers illuminate the depth of that crisis. For example, at the time of the DOJ OIG inspection, "FMC Devens's Health Services Department was staffed at 76 percent, with 113 of 149 positions filled." *Id*., at 10.[26]

Yet, even that deficit constituted an underestimation. As the *2024 FMC Devens Report*, "this low staffing percentage does not reflect the true staffing crisis the Health Services Department is experiencing." *Id*. The *2024 FMC Devens Report* provided specific examples as well:

- "The Chief Pharmacist, the Chief Psychiatrist, and the Director of Nursing have also retired since our inspection; these positions remained vacant as of October 5, 2024. Further, both the Chief Dental Officer and Deputy Chief Psychologist positions were vacant." *Id*, at 11;

- "Other vacancies at the time of our inspection include 24 percent of nurse positions (10 of 42 filled) and 45 percent of pharmacist positions (5 of 11 filled)." *Id*.

The implications are, of course, ominous. The *2024 FMC Devens Report* expressed

> concern[] that the staffing crisis could limit medical services provided to inmates and negatively affect the institution's ability to care for inmates, including inmates who may have been transferred to FMC Devens expressly for specific medical programs, such as

---

[26] For FMC Devens as a whole, the *2024 FMC Devens Report* "found that 81 percent (432 of 533) of FMC Devens' total positions were filled." *2024 FMC Devens Report*, at 7.

dialysis, transplant, or the Memory Disorder Unit (MDU).

*Id.*, at 11 n.9.

Again, the problems identified are not limited to FMC Devens.  As the *2024 FMC Devens Report* points out,

> [a]s described extensively in previous OIG oversight products, staffing shortages and employee allocations are among the chief and long-standing operational challenges facing the BOP enterprise-wide.

*Id.*, at 7.

FMC Devens's staffing crisis also affects the other BOP FMC's nationwide (of which there are a total of seven, including FMC Devens, with six populated by male inmates).  For instance, FMC Devens's staffing shortage compelled it to "pause in accepting Medical Care Level 4 inmates[,]" which the *2024 FMC Devens Report* characterized as "concerning because restricting the transfer of inmates with advanced medical care needs to a Federal Medical Center could negatively affect the health and care of those inmates[,]" *id.*, at 12, because "[t]hose inmates may be required to remain at an institution that lacks advanced medical care, which could exacerbate an inmate's medical condition and require the BOP to incur significant costs for outside care."  *Id.*

> **b.    *The Crisis in Delivering Adequate Health Care Exists Throughout the BOP System***

The "pause" at FMC Devens could also create burdens on the resources at other FMC's that are forced to accept or keep inmates who would otherwise be transferred to FMC Devens. That ripple effect spreads across the BOP FMC system, simultaneously causing the resource issues to migrate system-wide.

59

Robert Hood, a former warden with two decades of experience inside BOP, told *NPR* that the staffing situation has worsened the past few years, and that "[c]learly, the critical lack of staff impacts the safety and security of federal prisons.  Equally as important, the healthcare for 160,000 federal inmates is under fire . . ."  Meg Anderson, "Lawmakers push for federal prison oversight after reports of inadequate medical care," *NPR*, December 12, 2023 ("*Lawmakers push*"), available at https://n.pr/3tnpTS2.  Mr. Hood described it as "a terrible situation for many offenders with medical issues."  *Id*.

The problems identified in the *2024 FMC Devens Report* are not simply widespread, but they are also longstanding.  The *2024 FMC Devens Report* points out that in a March 2016 report, the DOJ OIG "found that medical personnel positions were filled at only 83 percent across the BOP."  *Id*., at 13, *citing Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, DOJ OIG, Evaluation & Inspections Division, 16-02, March 2016 ("*2016 BOP Medical Staffing Review*"), available at https://oig.justice.gov/reports/2016/e1602.pdf.  *See also Review of Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic*, Pandemic Response Accountability Committee, September 2023, available at https://bit.ly/47gp7V0.[27]

---

[27]  As described in the *2024 FMC Devens Report*, the *2023 Pandemic Response Report*

> detailed a variety of contributing factors, including noncompetitive pay, limited career advancement opportunities, and the additional stressors and responsibilities associated with working in a correctional setting compared to those associated with working in the community.

*2024 FMC Devens Report*, at 13.  In addition, the *2023 Pandemic Response Report* "also detailed how these shortages contributed to decreases in patient satisfaction and delays in routine and preventive care during the" Covid 19 pandemic.  *Id*.

Yet nearly a decade later, "[a]s [the DOJ OIG observed during [its] inspection of FMC Devens, the BOP's medical personnel shortages persist." *2024 FMC Devens Report*, at 13.

BOP's inattention to its problems – thereby aggravating and accelerating their impact – is also longstanding. Again, the *2024 FMC Devens Report* provides an illustrative example:

> In a March 2022 audit report on the BOP's use of comprehensive medical services contracts to facilitate outside medical care for inmates, we found that, due to the limited availability of employees to escort inmates, the BOP was not always able to transport inmates to scheduled outside medical appointments.

*Id.*, at 18.

Proposing a solution, DOJ OIG "recommended that the BOP implement a reliable, consistent process throughout all BOP facilities to monitor and analyze wait times for outside inmate appointments and the causes for canceled or rescheduled appointments in order to ensure that inmates receive timely medical care." *Id.* Notwithstanding that modest, constructive proposal made four years ago, "[a]s of the publication of [the *2024 FMC Devens Report*], this recommendation remains open." *Id.*[28]

Indeed, six years ago, in an August 23, 2019, Declaration of Phillip S. Wise (ECF # 788-1) ("*Wise Dec*"), submitted as part of the sentencing submission on behalf of co-defendant

---

[28] In response to the *2024 FMC Devens Report*, BOP candidly admitted its flaws, albeit without any tangible plan for rectifying them:

> This inspection report is one of several that have highlighted FBOP's staffing shortages and infrastructure challenges. The FBOP agrees that staffing shortages and crumbling infrastructure can create dangerous conditions in our institutions and compromise the health and security of FBOP employees and those in our care and custody. Addressing these challenges are among our top priorities.

*Id.*, at 45 (Appendix 4). *See also id.*, at 57 (Appendix 5).

Joseph DiNapoli, Mr. Wise – who from 1999 until he retired in February 2002, "served as the Assistant Director of [BOP's] with responsibility for Health Care for the agency[,]" *Wise Dec.*, at ¶ 1 – catalogued the challenges BOP confronts in housing aging inmates like Mr. DiNapoli (and, similarly, Mr. Madonna).

In addition to the limited number of FMCs, *id.*, at ¶ 5 "the scope of medical care and [an inmate's] access to medical specialists will be more limited in custody than his current access in the community; . . . the effective management of chronic medical conditions over time in a correctional setting is difficult; . . . his current prescription medication regimen is likely to be changed to comply with the BOP national formulary; [and] . . . BOP is ill equipped to effectively manage the needs of elderly inmates." *Id.*[29]

Mr. Wise also noted that "[t]he difficulty in providing consistent and timely chronic care in the BOP is exacerbated by current staffing shortages[,]" and cited the "*2016 BOP Medical Staffing Review*'s admission that BOP "continues to experience great difficulty in recruiting and retaining qualified clinicians." *Id.*, at 15.

BOP's inadequate medical care has also attracted Congress' bipartisan attention. During December 2023 U.S. Congressional hearings, Sen. Dick Durbin (D – Ill.) remarked that "BOP must immediately prioritize correcting the ineffective, harmful standards and procedures used to determine when an incarcerated person will be seen by medical professionals." *Lawmakers push*. Sen. Chuck Grassley (R – Iowa) likewise stated that he was "deeply alarmed by reports

---

[29] Mr. Wise provided statistics from 2008 with respect to BOP's inability to control hypertension successfully, *see* Wise Dec., at ¶¶ 11-14, a problem that apparently persists today. *See United States v. Tagliaferro*, 2024 WL 5077350, at *5 (discussed above, at 31-32). *See also* above, at 31 (citing cases finding that BOP failed to provide inmates adequate medical care).

that the Bureau of Prisons has demonstrated foot dragging when it comes to providing medical care to those in its custody," adding that "BOP needs to be held responsible for this failure and take action to raise its standards." *Id*.[30]

Moreover, BOP's reaction – moving inmates in an ineffective game of medical musical chairs – represents bureaucratic maneuvering rather than a genuine attempt to resolve the issues. As Sen. Durbin noted, "[s]imply transferring incarcerated adults to new facilities in the hope that they will receive care, without adequately addressing the dire staffing issues or fortifying facility medical units, is not a solution." *Id*.[31]

---

[30] Delays in medical care, including specifically outside specialist visits and testing, aggravate medical conditions and eventually require substantially more resources than prompt care would. As Robert Cohen, a member of New York City's Board of Correction (a watchdog agency that monitors jails), and a former director of health services on Rikers Island, pointed out,

> [i]n a population of thousands of people, many of whom have been there for years, there will be serious medical problems, . . . If they don't get to the clinic when they need to, when they don't get the laboratory tests that they need, when they don't get to the hospital when they need to, serious complications are inevitable.

Jonah E. Bromwich, "Medical Care at Rikers Is Delayed for Thousands, Records Show", *The New York Times*, February 1, 2022, available at https://bit.ly/45cmHJI.

[31] BOP's longstanding lack of accountability is illustrated by this disturbing passage from the *Lawmakers push*:

> The lawmakers specifically called for more independent supervision of the BOP, which operates with little transparency or oversight. For instance, until NPR published its investigation, the bureau stated on its website that it was accredited by the Joint Commission, which accredits the vast majority of U.S. hospitals, when in fact its certification had lapsed two years prior. The claim has since been deleted.

*Lawmakers push* further noted that "[w]hen any facility in the community is no longer accredited, it has 'real consequences,' says Dr. Jody Rich, a professor of medicine and

Inexorably, and unfortunately, "[s]ources NPR interviewed say all this leads to a troubling conclusion:  Federal inmates – a group with a constitutional right to health care yet without the autonomy to access it on their own – are dying more often than they should."  Meg Anderson, "1 in 4 inmate deaths happen in the same federal prison. Why?" *NPR*, September 13, 2023 ("*Inmate Deaths Happen*:), available at https://bit.ly/3G4tnf8.

Michele Deitch, director of the University of Texas at Austin's Prison and Jail Innovation Lab, told NPR, "'Deaths in custody should be rare events, given that this is such a controlled environment."  *Id*.  Thus, Ms. Deitch asked (and answered), "'Are there preventable deaths happening in the BOP? The answer to that is clearly yes.'"  *Id*.

    c.    ***The OIG's May 2024 Report on BOP's Failures to Screen and Follow Up for Colorectal Cancer***

The inordinate and material delays ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ apparently are emblematic of BOP's failures with respect to screening for colorectal cancer ("CRC"), and providing timely colonoscopies for inmates.

Just last month the DOJ OIG issued a report that "identified several serious operational and managerial deficiencies that the BOP must address to ensure that inmates receive proper screening and treatment for CRC."  DOJ OIG, *Evaluation of the Federal Bureau of Prisons'*

---

epidemiology at Brown University.  But, he added, because of the lack of oversight at federal prison facilities, it's difficult to assess the significance of the bureau discontinuing its Joint Commission accreditation.  'Nobody can tell you if it matters,' Rich said."  *Id*.

*Colorectal Cancer Screening Practices for Inmates and Its Clinical Follow-up on Screenings*,

Evaluations & Inspection Division, 25-057, May 2025, at i (Executive Summary) ("*May 2025*

*DOJ OIG CRC Report*"), available at

https://oig.justice.gov/sites/default/files/reports/25-057.pdf.

The *May 2025 DOJ OIG CRC Report* evaluated CRC screening rates from January 2020

through April 2024 – coinciding with Mr. Madonna's tenure in federal custody in this case – as

well as follow-up care for inmates who received CRC screening. *Id*., at 20. The findings reveal

a system that fails to adhere to appropriate standards, and thereby places inmates in substantial

danger with respect to undetected development of CRC.[32]

### i.    *Insufficient and Episodic Screening for CRC*

Regarding CRC screening, the *May 2025 DOJ OIG CRC Report* "found that less than

two-thirds of average-risk inmates ages 45 through 74 were offered screening between April

2023 and April 2024, with screening offers varying widely by BOP facility." *Id*., at 8. *See also*

*id*., at 14 ("only about 47 percent (17,796 of 37,942) of average-risk inmates had a completed

annual CRC screening in the previous year, as of April 2024").

Also, "less than half of average-risk inmates had a completed, up-to-date CRC screening,

with only 10 of the BOP's 97 facilities meeting the BOP's National Performance Measures

(NPM) for sustained or demonstrated performance in CRC screening completion."[33] Ultimately,

---

[32] The *May 2025 DOJ OIG CRC Report* also noted that "[p]rior OIG reports have
identified concerns with BOP health services, including staffing and timely access to medical
care." *Id*., at I (Executive Summary). Those reports are listed in Appendix 2 of the *May 2025
DOJ OIG CRC Report*.

[33] The *May 2025 DOJ OIG Report* notes that BOP's "guidance stipulates that, if an
inmate is classified as being at increased risk, the clinical provider should follow American

the *May 2025 DOJ OIG CRC Report* "found that 57 percent (188 of 327) of inmates in our sample received fewer than the expected number of annual screening offers based on their age." *Id*., at 17.

However, "[m]ore concerning, [the *May 2025 DOJ OIG CRC Report*] found that 51 inmates (16 percent) who should have received multiple annual screening offers based on their age received positive screening results the first and only time they were offered CRC screening." *Id*.

The *May 2025 DOJ OIG CRC Report* attributed the low screening rates to a number of factors, including:

- "Vacancies in Key Areas of Responsibility.  The OIG found that how a BOP facility chooses to assign CRC screening responsibilities affects its ability to offer screening. Interviewees at both the facility and regional levels identified key-role vacancies that they believe limit BOP facilities' ability to offer screenings." *Id*., at 10;  and

- "Vacancies Affecting Prioritization of Routine Screening . . . [OIG inspectors] were told that staffing shortages often mean that employees have to prioritize addressing urgent medical needs and daily responsibilities, such as medication delivery and sick call, over preventive care." *Id*.

### ii.    *Insufficient Documentation and Computer Records Capability*

BOP procedures and tracking software to gauge risk and conduct screening were also deemed inadequate.  For example, the *May 2025 DOJ OIG CRC Report* "found that inmates age 75 were not included in BOP tools used to identify and track which inmates need annual screening." *Id*., at 8.  In addition, "[d]espite the BOP's guidance for screening inmates at increased risk for CRC, [OIG inspectors] found that the BOP does not have a way to accurately

---

Cancer Society (ACS) screening recommendations." *Id*., at 30.

and comprehensively identify the entire increased-risk population due to limitations within [the Bureau Electronic Medical Records System ("BEMR")]." *Id.*, at 31.  Nor does BOP "have a standardized method to document future CRC screening needs for increased-risk inmates within BEMR." *Id.*

Overall, the *May 2025 DOJ OIG CRC Report* concluded that BOP "cannot identify the true increased-risk population because of limitations within BEMR. BEMR does not have a dedicated field to specify that an inmate is at increased risk for CRC." *Id.*  Moreover, BOP "lacks sufficient oversight mechanisms to ensure that inmates identified as being at increased risk for CRC are appropriately screened and monitored." *Id.*, at 32-33.  The "lack of standardized provider documentation and workflow in BEMR[]" further "creates a potential risk that CRC screening and follow-up could be affected by providers' ability to find relevant information in the medical record." *Id.*, at 33.

### iii.     *Insufficient Follow-Up for Positive CRC Screening Results*

BOP's follow-up rates for those inmates with a positive CRC screening result were also inadequate.  The *May 2025 DOJ OIG CRC Report* "found that around 10 percent of inmates with a positive CRC screening had no follow-up documented in their medical record[,]" while "[a]n additional 4 percent had some initial follow-up, but the documentation was not sufficient to determine whether or what follow-through ultimately occurred." *Id.*, at 20.  *See also id.*, at 23 ("[i]n total, [OIG inspectors] found that 14 percent of the cases in our sample (47 of 327) had unclear documentation related to whether and which clinical follow-up had occurred").

The consequences of such poor documentation are potentially dire for inmates:

> [t]he lack of clear documentation in BEMR represents a risk that
> inmates may not be receiving appropriate care, either because they

67

are not receiving the care that the BOP expects or because future
medical decisions could be made using incomplete health records.

*Id.*, at 23.

### iv.     *Intolerable Delays in Performing Colonoscopies*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████     The *May 2025 DOJ OIG CRC Report*

"found that for those 133 inmates [in the OIG's sample] the average wait time between the

positive screening result and colonoscopy was 8 months, with a median of 7 months." *Id.*, at

24.[34]

As part of its evaluation,

> the OIG requested the total number of colonoscopies completed
> between January 2022 and December 2023, regardless of reason.
> The OIG found that during this period the BOP completed 4,742
> colonoscopies and that the average time between ordering a
> colonoscopy and when the colonoscopy was performed was
> approximately 6 months.

*Id.*, at 25.  *See also id.*, at 28 ("[o]f those completed colonoscopies, 54 percent (72 of 133) of the

appointments occurred after their target date").

The  *May 2025 DOJ OIG CRC Report* also included two case studies.  One involved

Robert Hanssen (a former FBI agent convicted of espionage), who "died of metastatic colon

cancer, having never received a CRC diagnosis" or a colonoscopy despite three positive CRC

---

[34]  For some inmates the wait was significantly longer:  "Eight of the inmates in our
sample had over 18 months elapse between their positive CRC screening result and their
colonoscopy, including three inmates who waited more than 2 years between their positive
screening result and colonoscopy."  *May 2025 DOJ OIG CRC Report*, at 24.

screening results over a seven-year period.  *Id.*, at 20, 35-37.

The other involved Frederick Bardell, *id.*, at 28, 37-39, 54 years old, whose abysmal maltreatment by BOP in 2020-21 was detailed at the time in a court opinion that excoriated BOP. *See, e.g., United States v. Bardell*, 634 F. Supp. 3d 1083 (M.D. Fla. 2022).  In its opinion, the Court in *Bardell* admonished both BOP and a Warden because they "disregarded the Court's directives[,]" *id.*, at 1089 (internal citations omitted), and for "their blatant violation of a Court Order and sheer disregard for human dignity."  *Id.*

The Court further recommended that DOJ "undertake an investigation into the circumstances of Mr. Bardell's confinement and treatment, the failure of the BOP to respond to his medical needs, and the BOP's misrepresentations in connection with the compassionate release briefing regarding the seriousness of his condition."  *Id.* at 12.

Mr. Bardell died from metastatic colon cancer nine days after his release from BOP custody, engineered by BOP enlisting another inmate to deposit a very weak Mr. Bardell at the Dallas-Fort Worth airport, abandoned, unchaperoned, and without support "to fend for himself." *Id.*, at 1085.

## 2.    *BOP Has Failed to Account for the Practical and Economic Impact of the Increased Proportion of an Aging U.S. Federal Prison Population*

Another important aspect of BOP's medical neglect and dysfunction is its failure to account and plan for – operationally or infrastructurally – the significantly increasing proportion of the U.S. federal prison population that is aging.  In that context, "[t]he proportion of state and federal prisoners who are 55 or older is about five times what it was three decades ago.  In 2022, that was more than 186,000 people."  Meg Anderson, "The U.S. prison population is rapidly graying.  Prisons aren't built for what's coming," *NPR*, March 11, 2024 ("*Rapidly Graying*"),

available at https://bit.ly/43vhQQF.[35]

A 2015 DOJ OIG report attempted to quantify the costs, and "found that the BOP's aging inmate population contributes to increases in incarceration costs.  Aging inmates on average cost 8 percent more per inmate to incarcerate than inmates age 49 and younger (younger inmates)." *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, DOJ OIG (2015) ("*Aging Inmate Population*"), at i, ii, available at https://oig.justice.gov/reports/2015/e1505.pdf.

The *Aging Inmate Population* report also discovered that "federal prisons with the highest percentage of elderly prisoners spent five times more per person on medical care than those with the lowest percentage of aging prisoners."  *Rapidly Graying*.

*Aging Inmate Population* added ominously that

> BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose.  Aging inmates often require assistance with activities of daily living, such as dressing and moving around within the institution.  However, institution staff is not responsible for ensuring inmates can accomplish these activities.

*Id*., at ii.

In addition *Aging Inmate Population* reported that delays in medical care for aging inmates is also caused by understaffing, either due to "limited medical staff within institutions" or a "lack [of] Correctional Officers to staff these trips" outside of institutions and to hospitals to

---

[35]  According to accepted standards, "[c]orrectional health experts typically define the prison population as 'older' at the age of 50 or 55 due to 'accelerated aging,' evidenced by the disproportionately high rates of medical and functional limitations found in prisoners at younger ages than in community-dwelling older adults."  Ahalt, Cyrus, *et al*. "Paying the price:  the pressing need for quality, cost, and outcomes data to improve correctional health care for older prisoners," *Journal of the American Geriatrics Society*, vol. 61, 11 (2013) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3984258/.

receive medical care.  *Id*., at ii.

   *Aging Inmate Population* "further found that limited institution staff and inadequate staff

training affect the BOP's ability to address the needs of aging inmates."  *Id*., at i.  Compounding

the problem, "[t]he physical infrastructure of BOP institutions also limits the availability of

appropriate housing for aging inmates."  *Id*.  *See also Wise Dec.*, at ¶ 20;  *Inmate Deaths*

*Happens*.

   Ultimately, *Aging Inmate Population* concluded that "BOP's ability to confine its aging

inmate population is insufficient due to overcrowding in its institutions, as well as problems with

their internal and external infrastructures."  *Id*., at 23.  *See also id*., at 24 ("[l]ower bunks,

essential for accommodating aging inmates with mobility limitations or medical conditions, is

limited by the overcrowding of BOP institutions").

   As a professional U.S. geriatric journal pointed out a decade ago – and the segment of the

prison population that is aging has only increased since then –

>          [a]s the population ages, healthcare costs rise, states are forced to
>          cut spending, and many correctional agencies struggle to meet this
>          legal standard of care.  Failure to meet the healthcare needs of
>          older prisoners, who now account for nearly 10% of the prison
>          population, threatens avoidable suffering in a medically vulnerable
>          population and violation of the constitutional mandate for timely
>          access to an appropriate level of care while incarcerated.

Ahalt, Cyrus *et al*. "Paying the price:  the pressing need for quality, cost, and outcomes data to

improve correctional health care for older prisoners."  *Journal of the American Geriatrics*

*Society*, vol. 61, 11 (2013), available at www.ncbi.nlm.nih.gov/pmc/articles/PMC3984258/.

   Yet BOP is unable to meet the current needs – medical, psychological, hygienic, safety,

and legal – of the population for which it assumes responsibility, much less those on the horizon

as a significant percentage of that population ages and requires even more care.  *See* Opinion, Carmilla Floyd, "Elderly and Imprisoned:  'I Don't Count It as Living, Only Existing,'" *The New York Times*, October 21, 2023, available at https://nyti.ms/3NzbHwn.

In that context, Mr. Madonna's continued incarceration would have a decidedly negative impact not only on him, but also on BOP's already significantly limited sources.  As reported in February 2024, a BOP executive told a *Forbes* columnist, "the sentences of people like an 80 year old sick inmate who is going to a federal medical center because of his illness represents a burden to the agency."  Walter Pavlo, "Federal Judges Consider Federal Prison Conditions During Sentencing," *Forbes*, February 27, 2024, available at https://bit.ly/3ZB9NRK.

That BOP executive, "who wished not to be named[,]" added that "[b]ed space in federal medical centers is precious and it often is the last resort for inmates who are sick but who have long prison sentences."  *Id*.

### 3.    *BOP Generally Is In Crisis In Multiple Facets of Its Mission and Obligations*

As DOJ IG Horowitz, as well as BOP officials, acknowledge, BOP is suffering crises in many aspects of its institutional mission and responsibilities.  Indeed, DOJ IG Horowitz, in an October 2024 annual report to the Attorney General listing the principal challenges confronting DOJ, after enumerating as "Challenge 1:  The Ongoing Crisis Facing the Federal Corrections System," stated that

> [w]hile these challenges are not rank ordered, *we believe that it is critical that the Department address the escalating strategic management and operational challenges facing the federal correction system*, which is beset by *deteriorating facilities, staffing challenges, and concerns over institutional safety and security and healthcare*.

DOJ OIG, *Top Management and Performance Challenges Facing the Department of Justice –*

*2024*, Michael E. Horowitz, October 10, 2024, at i, 1 (emphasis added) ("*Top Challenges*"),

available at https://oig.justice.gov/sites/default/files/2024-11/TMPC-2024.pdf.

> *Top Challenges* elaborated that

>> [t]he serious issues identified during recent OIG unannounced inspections of Federal Bureau of Prisons facilities, including significant facility issues affecting the conditions of inmate confinement and operational deficiencies in core inmate management and security functions, have heightened concern about the Department's ability to fulfill basic mission requirements.

*Id.*, at i-ii.

Referring to DOJ IG Horowitz's February 2024 Congressional testimony, *see* above, at

55, BOP's "recurring, chronic problems have been well over a decade in the making." *Id.*, at 1.

*Top Challenges* recounted that "over the past 20 years, the OIG has issued over 100 reports

detailing these serious systemic issues facing the BOP." *Id.*

Through that process, DOJ OIG's "oversight reports have identified recurring issues that

impede the BOP's efforts to consistently ensure the health, safety, and security of all staff and

inmates within its custody." *Id.*  In addition, attesting to the "the long-standing crisis facing"

BOP, *id.*, "the Comptroller General for the first time added the BOP to the U.S. Government

Accountability Office's high-risk list due to its 'long-standing challenges with managing staff

and resources, and planning and evaluating programs that help incarcerated people successfully

return to the community.'" *Id.*

Continuity of leadership has also proven difficult for BOP, and contributes to its

dysfunction.  When then-Director Peters assumed the Director's position in 2022, she became

the *sixth* BOP Director within as many years, illustrating the lack of continuity in and

commitment to the position.  *See* Alan Ellis and Walter Pavlo, "The Bureau of Prisons and the challenges going into 2024," *Federal News Network*, February 21, 2024 ("*BOP 2024 Challenges*"), available at https://bit.ly/3ILnox9.

Director Peters's tenure lasted 30-months – during which she at least candidly identified and acknowledged BOP's several challenges – ended when she either resigned or was terminated January 20, 2024, the day of President Trump's inauguration.  *See* Walter Pavlo, "Bureau Of Prisons Director Colette Peters Out On Trump's First Day," *Forbes*, January 21, 2025 ("*Director Peters Out*"), available at https://bit.ly/4kHqNOb ("[t]he challenges [Director Peters] faced at the BOP on day-one of her job in August 2022 were pretty much the same at the end;  staffing shortages, crumbling buildings and poor morale").  *See also id*. ("[t]here were problems that Peters just could not fix. Staffing, no matter how much money was spent to increase salaries and retention bonuses, was proven to have only modest success").

The turnover is also an impediment to sustained efforts to remedy BOP's problems, as "[w]ith Peters' exit, it will mean that the next director will be the sixth since Trump took office for his first term."  *Id*.  *See also* Walter Pavlo, "Bureau Of Prisons Executives Announce Retirement Ahead Of New Director," *Forbes*, February 17, 2025 ("*BOP Executives Announce Retirement*"), available at https://bit.ly/41p9yux (BOP "is currently experiencing significant upheaval, with a wave of leadership departures leaving the agency without clear direction during a critical time").

Compounding that problem immeasurably, former Director Peters's departure was followed just days ago by the sudden retirement of her successor, the Acting Director, William W.  Lothrop, a 33-year veteran of BOP, and five other members of BOP's Executive Team (all

74

with at least 25 years' experience with BOP, and including two regional directors and BOP's general counsel). *See BOP Executives Announce Retirement*. *See also* https://bit.ly/3CZ2Ul5.

Thus, at a time when leadership and institutional knowledge is of paramount importance, BOP was rudderless without anyone at the helm. *See also BOP Executives Announce Retirement* (BOP is "grappling with pre-existing operational challenges exacerbated by the sudden leadership vacuum").

In early April, a new BOP Director, William K. Marshall III, was appointed. Mr. Marshall does not have any federal correctional experience; his prior correctional service was two years as director of West Virginia's state prison system, which houses 6,000 inmates (compared with BOP's 155,000). *See* Beth Schwartzapfel, Keri Blakinger, and Shannon Heffernan, "Who Is Billy Marshall? What to Know About Trump's New Bureau of Prisons Director," *The Marshall Project*, April 12, 2025 ("*Who Is Billy Marshall?*"), available at https://bit.ly/4mG2Xo0; Walter Pavlo, "Trump Announces New Director Of The Bureau Of Prisons," *Forbes*, April 11, 2025, available at https://bit.ly/4kkahEk.

While Director Marshall has not announced any specific plans to resolve BOP's multiple crises, he did recently appear on television to promote the President's plan to convert Alcatraz, a former federal prison that has been a museum for more than 50 years, and inactive as a penitentiary for more than 60, into an operational federal correctional facility. *See* https://www.foxnews.com/video/6373000478112 (in response to a question whether it was possible to recommission Alcatraz as a prison, Director Marshall replied, "To have the opportunity to be the director of the Bureau of Prisons that has the opportunity to reopen Alcatraz, I mean how exciting does that feel, you know? When you think about Alcatraz you think about Fenway

Park, Wrigley Field, Lambeau Field, those types of facilities"). *See also* Caitlin Keith, "Does

Trump's plan to reopen Alcatraz pass the DOGE test?" *Deseret News*, May 5, 2025, available at

https://bit.ly/4kkamYE (Director Marshall declared BOP will "'pursue all avenues' to implement

Trump's proposal for reopening the prison[,]" adding that he has "ordered an immediate

assessment to determine our needs and the next steps, . . . We will be actively working with our

law enforcement and other federal partners to reinstate this very important mission").

  Indulging in that wishful thinking at best – those familiar with Alcatraz point out that it

lacks functioning "water, electricity, heat, and sanitation[,]" according to John Martini, a

historian whospent several years on Alcatraz as a ranger with the National Park Service[36] –

rather than confronting BOP's manifold problems does not inspire confidence that those

problems will be afforded the attention they require, or be resolved in any material, substantive

respect.

---

  [36] Bernd Debusmann Jr., "Is Donald Trump's plan to reopen Alcatraz as a prison realistic?" *BBC*, May 5, 2025 ("*Plan to Reopen Alcatraz*"), available at bbc.com/news/articles/cly5d9yzr7wo. In fact, "Alcatraz was shuttered in 1963 'because the institution was too expensive to continue operating,' according to theFederal Bureau of Prisons." Bill Chappell, "Trump says he will reopen Alcatraz for the 'most ruthless and violent' prisoners," *NPR*, May 5, 2025, available at https://bit.ly/43k5FYH. Isolated on an island, all supplies had to be transported by boat from the mainland to Alcatraz (and all refuse dumped in San Francisco Bay), making the facility – which housed only 340 inmates at its peak – three times more expensive per prisoner even at the time of its closure. In addition, Hugh Hurwitz, "who served as acting director of the BOP between May 2018 and August 2019, told the BBC 'To be frank, at first I thought it was a joke. . . . It's not realistic to think you can repair it. You'd have to tear it up and start over." *Plan to reopen Alcatraz*. *See also id.* ("experts say that refurbishing the dilapidated remains of the once-formidable prison is 'not realistic at all'"). *See also* Devlin Barrett and Shawn Hubler, "Trump Says He Wants Alcatraz Restored as a Prison," *The New York Times*, May 4, 2025, available at https://bit.ly/43R8xMJ ("[i]t was not immediately clear how [President Trump's] musing could be put into action, given that any such project would be extraordinarily expensive and that the administration already planned to cut billions of dollars from the Justice Department budget").

Nor will it assuage the demoralized federal prison workforce, already "unhappy about the president's recent order to end collective bargaining for federal workers[,]" *Who Is Billy Marshall?*, and reeling from the February 2025 directive to cease incentive retention pay designed to entice staff retention and recruitment. *See* Erich Wagner, "23,000 federal prison workers are set to take pay cuts upto 25% next month," govexec.com, February 26, 2025, available at https://bit.ly/4dLIoma ("[m]ore than half of the workforce at the U.S. Bureau of Prisons will see their paychecks cut byas much as 25% next month, as the agency seeks to cut costs as it operates under acontinuing resolution").

Indeed, *Top Challenges* warns that "[a]ddressing these challenges at the BOP will not only require the sustained and serious attention of the BOP Director and the Department leadership, but also of the Office of Management and Budget and Congress." *Top Challenges*, at 1.

While BOP management like Mr. Marshall engage in magical thinking about a mythical resurrection of an iconic prison as a panacea, *Top Challenges* realistically focused on BOP's "persistent inability to address staffing shortages in key positions, lack of sufficient funding to repair its crumbling infrastructure, and the introduction of contraband at its prisons[,]" which have already "seriously compromised the safety and security of staff and inmates." *Top Challenges*, at 1.[37]

---

[37] While *Top Challenges* adds that BOP "has undertaken BOP-wide efforts to determine the staffing needs of its facilities, how its salary structure impacts its ability to recruit and retain employees, and the amount of funding it needs to repair and maintain its facilities[,]" that constitutes simply further examination of the problems, rather than a plan to resolve them, or commencing a viable program for implementation. The latter two elements have consistently proved elusive for BOP.

In the current budgetary climate, improvement with respect to staffing retention and recruitment, and/or infrastructural repair and maintenance, in addition to other, related issues like health care, are not on the horizon.  Inmates are sure to suffer as a consequence.  Mr. Madonna already has.

**D.**    ***The Sentencing Commission's "Compassionate Release Data Reports"***

The underlying bases for Mr. Madonna's motion conform with the data compiled by the U.S. Sentencing Commission with respect to §3582(c)(1)(A) motions.  The Sentencing Commission initially published a report covering Fiscal Years 2020 through 2022, and has released an annual report for each Fiscal Year ("FY") since, with interim updates during the FY.  Thus, the most recent report covers the first two quarters of FY 2025 (October 1, 2024 through March 31, 2025).

The 2022 Compassionate Release Data Report provided nationwide statistics regarding the number and percentage of sentence modification motions granted corresponding to the dates the movants were sentenced.  *See* United States Sentencing Commission, *Compassionate Release Data Report*, December 2022 ("*2020-2022 CR Data Report*"), available at https://www.ussc.gov/ sites/default/files/pdf/research-and-publications/federal- sentencing-statistics/compassionate-relea se/20221219-Compassionate-Release.pdf.

For that period, the natural and doctrinal dividing line for the disposition of §3582 motions was, predictably, *United States v. Booker*, 543 U.S. 220 (2005).  For sentences imposed prior to *Booker* – encompassing the most severe era of Guidelines sentencing – the annual rate of

granted motions during FY's 2020-2022 was between 25.6% and 60%.  *Id.*  By comparison, for sentences imposed post-*Booker*, the annual rate for granted §3582 motions for those FY's was between 9.9% and 28.2%.  *Id.*

The Sentencing Commission data reports also list the reasons courts granted §3582 motions, the number of those granted motions, and the percentage of all granted motions each reason represented.  Regarding Mr. Madonna, the relevant factors cited for granting §3582 motions in FY 2024 were:

(1)     serious physical or medical condition (USSG §1B1.13(b)(1)(B)) – 94 motions, 12.5%;

(2)     terminal illness (U.S.S.G. §1B1.13(b)(1)(A)) – 58 motions, 7.7%;

(3)     COVID-19/pandemic (USSG §1B1.13(b)(1)(D)) – 25 motions (3.3%);

(4)     BOP failure to provide treatment (USSG §1B1.13(b)(1)(C)) – 13 motions (1.7%);

(5)     deteriorating physical or mental health due to aging process (USSG §1B1.13(b)(1)(B)) – 11 motions (1.5%);

(6)     age 65 and deteriorating health and served 10 years/75% (USSG §1B1.13(b)(2)) – 11 motions (1.5%);  and

(7)     Serious functional or cognitive impairment (USSG §1B1.13(b)(1)(B)) – 5 motions (0.7%).

*See* U.S. Sentencing Commission Compassionate Release Data Report, Fiscal Year 2024 ("*2024 CR Data Report*"), at Table 10, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/compassionate-release/FY24-Compassionate-Release.pdf.

For the two quarters of FY 2025, the numbers are roughly the same:

(1)     serious physical or medical condition (USSG §1B1.13(b)(1)(B)) – 40 motions,

12.6%;

(2)      terminal illness (U.S.S.G. §1B1.13(b)(1)(A)) – 18 motions, 5.7%;

(3)      COVID-19/pandemic (USSG §1B1.13(b)(1)(D)) – two motions (0.6%);

(4)      BOP failure to provide treatment (USSG §1B1.13(b)(1)(C)) – 5 motions (1.6%);

(5)      deteriorating physical or mental health due to aging process (USSG §1B1.13(b)(1)(B)) – 6 motions (1.9%);

(6)      age 65 and deteriorating health and served 10 years/75% (USSG §1B1.13(b)(2)) – 7 motions (2.2%);  and

(7)      Serious functional or cognitive impairment (USSG §1B1.13(b)(1)(B)) – 2 motions (0.6%).

*See* U.S. Sentencing Commission Compassionate Release Data Report, Preliminary Fiscal Year 2025 Cumulative Data through 2nd Quarter (October 1, 2024, through March 31, 2025) ("*2025 Q2 CR Data Report*"), at Table 10, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/compassionate-release/FY25Q2-Compassionate-Release.pdf.

Thus, the bases for Mr. Madonna's motion are well-established grounds for modification of sentence, as they comprise 25.2% of the courts' rationales for granting §3582 motions in FY 2024, and 28.9% for the first two quarters of FY 2025.

More generally, in FY 2024, 16% of §3582 motions were granted, *2024 CR Data Report*, at Table 3, compared with 13.8% in FY 2023.  *See* U.S. Sentencing Commission Compassionate Release Data Report, Fiscal Year 2023 ("*2023 CR Data Report*"), at Table 3, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistic s/compassionate-release/FY23-Compassionate-Release.pdf.  For the first two quarters of FY

2025, 15.2% of §3582 motions were granted.  *See 2025 Q2 CR Data Report*, at Table 3.

In addition, the Second Circuit has had either the highest or second highest percentage of §3582 motions granted:  27% for FY's 2020-2022 (second to the Ninth Circuit's 28.6%), *see 2020-2022 CR Data Report*;  39.1% for FY 2023 (highest), *see 2023 CR Data Report*, at Table 3;  34.9% for FY 2024 (highest), *see 2024 CR Data Report*, at Table 3;  and 32.8% during the first two quarters of FY 2025 (second highest to the Ninth Circuit's 33.9%%).  *See 2025 Q2 CR Data Report*, at Table 3.

**E.**      ***Mr. Madonna's Imprisonment for State Offenses Formally Incorporated In This Case Extends His Incarceration Beyond the Threshold 10-Year Minimum for Eligibility for Relief Pursuant to Guidelines §1B1.13(b)(2)***

As set forth above, at 3, Guidelines §1B1.13(b)(2) provides an alternative means of relief pursuant to §3582 if the defendant "(A)  is at least 65 years old;  (B)  is experiencing a serious deterioration in physical or mental health because of the aging process;  and (C)  has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."

Here, Mr. Madonna is 89 years old, and – based on Dr. Chen's Declaration augmented by the subsequent developments detailed above, at 27-29 – "is experiencing a serious deterioration in physical or mental health because of the aging process[.]"  Consequently, he clearly satisfies prongs (A) and (B) of §1B1.13(b)(2).

Regarding the third criterion, it is respectfully submitted that Mr. Madonna's term of incarceration should include the previously imposed – and partially discharged – sentences he was serving for New York and New Jersey offenses that were fully incorporated in the current prosecution.  That would place him on the cusp of the ten-year threshold requirement for §1B1.13(b)(2), which he would eclipse as of September 30, 2025.

As the government established at trial by Stipulation (GX 1507, which authenticated and admitted Mr. Madonna's respective guilty plea allocutions (GX 221-C & GX 222-C) and judgments (GX 221-B & GX 222-B), Mr. Madonna pleaded guilty January 12, 2015, in New York State to "enterprise corruption" in violation of New York's Organized Crime Control Act ("OCCA"), and in New Jersey June 17, 2015, to a violation of that state's racketeering statute.

Also, as the government argued in seeking admission of the convictions, and to the jury in opening and summation, the conduct underlying both the New Jersey and New York State convictions was encompassed entirely by the allegations in this case. *See* T. 571, 4310. *See also* PSR, at ¶¶ 50 & 51 ("criminal conduct" in New York State and New Jersey cases "is considered part of the instant offense").

As a result, Mr. Madonna was sentenced to concurrent prison terms – five years in New Jersey, and 1-3 years in New York State – that he commenced serving September 30, 2015, nearly ten years ago. Those sentences expired February 7, 2019, while Mr. Madonna was already in pretrial custody in this case.[38]

As a result, Mr. Madonna is just over four months short of the ten-year mark for his aggregate incarceration in connection with the conduct prosecuted in, and encompassed by, this case (and he has surpassed a ten-year sentence if accrued good time is counted). Accordingly, it is respectfully submitted that Mr. Madonna's close proximity to the ten-year minimum in §1B1.13(b)(2) is another factor that supports granting his §3582 motion.

---

[38] Because Mr. Madonna was in the "primary custody" of New Jersey at the time of his arrest in this case, Mr. Madonna did not receive credit from BOP towards his sentence in this case for any of his time in custody prior to expiration of the New Jersey and New York State sentences. *See* Guidelines §§5G1.3(b) & (c); 18 U.S.C. §3584(a).

**F.**     *Mr. Madonna Was Willing to Resolve His Case With a Plea of Guilty*

Prior to trial, Mr. Madonna's counsel engaged in extensive negotiations with the government to reach a disposition without the need for trial. The government and Mr. Madonna agreed on a resolution that would include a plea of guilty to Count One – conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962(d), for which the maximum sentence would have been 20 years' imprisonment (because it would not have included the murder of Michael Meldish).

However, the government's offer was contingent on all four defendants pleading guilty, and that unanimity was not achieved. As a result, Mr. Madonna was compelled to proceed to trial, and was subject to the mandatory sentence of life imprisonment for his conviction on Count Three. That result distorted the punishment to which Mr. Madonna was exposed, and ultimately received.

**G.**     *Distance Has Made Family Access for Visits to Mr. Madonna Impossible*



Mr. Madonna's incarceration a considerable distance from New York – first at USP McCreary in Kentucky ███████████████████████████████████ and now at FMC Rochester ██████████████████████ – has made it impossible for ██ ████████████████████████████████████████████████████████████ █████████████████████ to visit him. In fact, Mr. Madonna has not received a single visit since he was transferred to USP McCreary.

Granting this motion would enable Mr. Madonna's ███████ to be with him in the final stages of his life. Otherwise, that will remain impossible for ██. *See also* BOP Program Statement,"Management of Aging Offenders" §5241.01 (April 14, 2022), available at

https://www.bop.gov/policy/progstat/5241_001.pdf ("3. AGENCY RESPONSIBILITIES Aging offenders may have needs that are different from their younger peers. They frequently deal with increased needs related to health care, physical and cognitive accommodations, mobility, sensory deficiencies, dementia, Alzheimer's disease, maintaining family contact, end of life and palliative care").

## POINT III

### ANALYSIS OF THE §3553(a) WEIGHS DECIDEDLY IN
### FAVOR OF GRANTING MR. MADONNA'S §3582 MOTION

In deciding a §3582 motion, 18 U.S.C. §3582(c)(1)(A)(i) instructs that the §3553(a) sentencing factors be considered "to the extent that they are applicable[.]"  Here, while certain of the relevant §3553(a) factors have remained static, the dynamic between those factors has shifted dramatically due to Mr. Madonna's medical circumstances. Also, because on Count Three the Court was constrained by statute, 18 U.S.C. §1959(a)(1), to impose upon Mr. Madonna a mandatory sentence of life imprisonment without parole, this motion represents the first opportunity for a genuine analysis of the §3553(a) factors for Mr. Madonna.

**A.**    ***Even Defendants Who Have Committed the Most Serious Offenses***
        ***Have Been Granted Modification of Sentence for Various Reasons***

As acknowledged above, the offenses for which Mr. Madonna has been convicted are unquestionably serious. However, for other defendants similarly situated – elderly defendants suffering from multiple serious medical conditions that significantly compromise their ability to provide self-care (or other defendants with compelling non-medical circumstances, or a combination of both) – the seriousness of the offense(s) of conviction has not presented an insuperable obstacle to modification of sentence.

For example, in *United States v. Russo*, 643 F. Supp.3d 325 (E.D.N.Y. 2022), the Court reasoned that "[e]ven though I am similarly troubled by the fact that Russo orchestrated two murders, I do not subscribe to that unyielding punitive concept in this case for a number of reasons[.]" *Id.*, at 335.[39]

In *Russo*, in granting in the defendant's motion despite his deep involvement in an organized-crime related double homicide, the Court relied on a constellation of factors – the defendant's background, his advanced age, his medical condition, and the sentencing disparity in comparison with co-defendants and other cases – in reducing the defendant's life sentence to a term of 35 years. *Id.*, at 336. *See also United States v. Tidwell*, 476 F. Supp.3d 66, 68 (E.D. Pa. 2020) (defendant serving term of life imprisonment granted release due to medical and other factors despite convictions for murder, drug, firearm, and criminal enterprise charges).

In *United States v. Quinones*, 00 CR. 761-1 (JSR), 2021 WL 797835 (S.D.N.Y. Feb. 27,

---

[39] In *Russo*, the Court considered the context of the homicide in a manner entirely relevant here with respect to Count Three:

> [t]hese statistics support the notion that murders are not homogeneous. At the risk of sounding cynical, there are different types of murders with different degrees of culpability. For example, there are murders of passion and murders of revenge. Here the murders were not directed at the public at large but were internecine executions of ruthless rival gang members. This turf warfare between rival factions of the Colombo family thirty years ago, where the mantra was probably "kill or be killed," is ancient gangland lore. Thus, due to the nature and circumstances of the offense, Russo's release at this time, and at his advanced age, is unlikely to pose a danger to the general public, satisfying the sentencing goal "to protect the public from further crimes of the defendant."

*Russo*, 643 F. Supp. 3d at 336, *quoting* 18 U.S.C. § 3553(a)(2)(C).

2021) and *United States v. Rodriguez*, 00 Cr. 761 (JSR) 2020 WL 5810161 (S.D.N.Y. Sept. 30, 2020), discussed above, at 36, two co-defendants tried and convicted of a capital torture-murder (but sentenced by the jury to life imprisonment without parole) were each granted reductions of their sentences to 35 years and 30 years, respectively, because of their "record of life-altering rehabilitation[]" while incarcerated. *Quinones*, 2021 WL 797835, at *4.[40]

In *Rodriguez*, the Court in examining the §3553(a) factors, cited the defendant's "lack of any significant disciplinary history," and the support of his family, as supporting a sentence reduction. *Rodriguez*, 492 F. Supp.3d at 315-316.  In *Quinones*, the Court cited the defendant's age ("he will be more than 65 years old upon his release") to support the conclusion that he is "unlikely to re-offend." *Quinones*, 2021 WL 797835 at *4.  *See also United States v. Gluzman*, 96 Cr. 323, 2020 WL 4233049, at *19 (S.D.N.Y. July 23, 2020) (granting release for defendant who hired a relative to help her murder her husband with an axe and hammer, before dismembering and disposing of the body).

In addition, in its decision in *Russo*, the Court granted another §3582 motion by a defendant in a separate case, *United States v. Moore*, 90 Cr. 10603 (FB) (ECF # 453) (E.D.N.Y. 2022).  The Court noted the similar factual posture of Mr. Moore's offenses – a RICO conspiracy in which Mr. Moore assumed the role of "enforcer" in that enterprise, and as part of which Mr. Moore was convicted of a brutal murder of a rival drug dealer – Mr. Moore's age (52) and his exemplary record, and his long sentence, as well as the fact that "like Russo, Moore's

---

[40]  In many of the cases discussed in this section, due to the amount of time the defendants had already served in prison, the reduction of their respective life sentences to a term of years constituted the functional equivalent of a time served sentence (particularly when accounting for accrued good time).

86

murders were internecine gang killings," contributed to justify a reduction of his sentence in consideration of the §3553(a) factors. *Russo*, 643 F. Supp.3d at 338.

Likewise, the severity of the defendant's offenses did not preclude modification of sentence in *United States v. Chan*, 645 F. Supp. 3d 71 (E.D.N.Y. 2022), in which the defendant "participated in one of the gang's signature crimes – the murder of potential witnesses," and, like Mr. Madonna, received a mandatory life sentence. In *Chan*, the basis for relief was not medical circumstances, but instead on the defendant's youth at time of the offense conduct. *See also United States v. Wong*, 90 Cr. 1019 (RJD) (ECF # 431) (E.D.N.Y. April 8, 2016), at 2 (sentence reduced from life imprisonment without parole to 35 years, in part due to defendant's youth at the time of the offense). *Id*., at 2; *see also* John Marzulli, "Gang member sentenced to life in prison as a teen will get second chance at life outside prison," *New York Daily News* (Apr. 8, 2016), available at bit.ly/3C5sOxR.

In *United States v. Garcia*, 01 Cr. 1110 (LAP), 2025 WL 1004409 (S.D.N.Y. April 3, 2025), too, the Court emphasized "the seriousness of the crimes here," which involved "taking the lives not just of one person but of three." *Id*., at *5. Notwithstanding defendant's conduct included "killings [that were] were ordered in the coldest blood as part of a war between criminal gangs," and her status as a "professional criminal for over a decade," the Court concluded that "the need for individual deterrence is not great" because of her age (73), the length of time served, and her family circumstances made it so that "the likelihood of recidivism is diminished." *Id*. As a result, her sentence was reduced to time served. *Id*., at *2.

Relief pursuant to §3582 has also been granted for defendants sentenced to life imprisonment as a result of convictions for leading extraordinarily extensive narcotics-

trafficking operations.  For instance, in *United States v. Millan*, No. 91 Cr. 685 (LAP) 2020 WL

1674058 (S.D.N.Y. April 6, 2020), the defendant's sentence was reduced to time served because,

although convicted after trial of "a most serious" offense – "large scale narcotics distribution" –

and sentenced to mandatory life imprisonment without parole pursuant to 21 U.S.C. §848(b) (the

"kingpin" statute), he had during his 28 years in prison "done everything in his power to

rehabilitate himself, as demonstrated by his genuinely exceptional accomplishments and

meritorious prison record."  *Id*., at *8.  *See also United States v. Piggott*, 94 Cr. 417, 2022 WL

118632, at *4 (S.D.N.Y. Jan 12, 2020) (§3582 motion by defendant serving sentence of life

imprisonment satisfied §3553(a) factors because his "advanced age and declining health mean

his likelihood of recidivating is low")

Similarly, in *United States v. Torres*, 464 F. Supp.3d 651 (S.D.N.Y. 2020), the Court

granted §3582 motions by two brothers after 33 years' imprisonment for their convictions and

life sentences imposed pursuant to 21 U.S.C. §848(a) for operating (at the time) the largest

street-level heroin conspiracy ever prosecuted in SDNY – described by the trial judge, Judge

Walker, as "abhorrent acts for which they have neither excuse nor explanation[,]" *Id*., at 658

(internal citations omitted)[41] – because they had "undertaken extraordinary efforts to better

themselves and their communities since their incarceration[,]" thereby demonstrating "[t]heir

remarkable postsentencing rehabilitation."  *Id*., at 659.  Both brothers also suffered from medical

conditions, hypertension, diabetes and age in one brother, and arthritis, gallbladder stones, and

age in the other.  *Id*., at 665.

---

[41]  Ultimately, Judge Walker supported the Torres brothers' earlier 2017 application for
commutation (which was denied), concluding that even the purpose of general deterrence had
been satisfied.  451 F. Supp.3d at 653.

88

More recently, in *United States v. Johnson*, 754 F. Supp. 3d 305 (E.D.N.Y. 2024), the Court did not grant a §3582 motion on medical grounds, which were present, but instead on other grounds, for a defendant serving a mandatory life sentence.  In *Johnson*, the Court pointed to the fact that the defendant "is now 61 years old," and found that the defendant's "comparatively advanced age is relevant to his characteristics and likelihood of recidivism when weighing all the §3553(a) factors." *Id.*, at 317, *citing to United States v. Miller*, No. 92-CR-91, 2024 WL 4107211 (E.D.N.Y. Sept. 6, 2024) at *19 (finding, in analyzing §3553(a) factors, that age of defendant (62 years old) greatly reduced likelihood of recidivism, in spite of defendant's violent criminal history.)

**B.**    ***In His Physically and Cognitively Compromised (and Deteriorating) Condition, Mr. Madonna Does Not Present Any Danger to the Community or of Recidivism***

Mr. Madonna's physical and cognitive condition, which is itself degrading over time, precludes his constituting either a danger to the community or a threat of recidivism.  That resolves an important issue upon which this Court, as set forth above, in POINT I(B) (37-41), has focused in denying §3582 motions by Mr. Madonna's co-defendants.

In that context, Mr. Madonna's current circumstances now implicate §3553(a)(2)(D) – "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner" – as a primary consideration.

As established above, through Dr. Chen's Declaration and the facts set forth above, at 15-29, as well as BOP's inability to provide adequate care for Mr. Madonna, *see* above, at POINT II(C) (54-78), that "medical care" cannot be provided Mr. Madonna "in the most effective manner" while he is imprisoned.

███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

████████████████████████████

Thus, physically, mentally, and organizationally, Mr. Madonna is not in a position to revert – indeed, he *cannot* revert – to criminal activity even in a supervisory capacity.[42]  Also, post-release supervision can reduce any danger of recidivism even further.  *See United States v. Bellamy*, 15 Cr. 1658, 2019 WL 3340699, at *6 (D. Minn. July 25, 2019) ("[a]ny limited risk can be mitigated by supervision").

Also, in other cases, courts have recognized the impact of age, health, and the passage of time on a defendant's capacity for recidivism.  As the Court in *United States v. Ortega*, 13 Cr. 814-1 (JMF), 2023 WL 2752160 (S.D.N.Y. Mar. 31, 2023), concluded,

> given that [the defendant's] medical condition severely limits his ability to complete daily, mundane tasks such as brushing his teeth, [the defendant's] physical and mental capacity to reoffend is extremely limited;  on top of that, he has taken steps to address the substance abuse disorder that played a role in his prior crimes.

2023 WL 2752160, at *2, *citing United States v. Asaro*, 17 Cr. 127, 2020 WL 1899221, at *1, *7 (E.D.N.Y. Apr. 17, 2020) (granting compassionate release to a previously violent defendant

---

[42]  The situation in *United States v. Gigante*, 982 F. Supp. 140 (E.D.N.Y. 1997), aff'd, 166 F.3d 75 (2d Cir. 1999) is easily and entirely distinguishable.  ████████████████████ ███████████████████████████████████████████████████ Rather, it was that any mental illness or incapacity *was feigned*.  *Id.*, at 146.  Also, *Gigante* did not involve *any* physical impairment – the defendant habitually was seen walking around his neighborhood (in his pajamas), *United States v. Gigante*, 925 F. Supp.2d 967, 971 (E.D.N.Y. 1996) – much less at the level from which Mr. Madonna currently suffers.

because his physical ailments, including expressive aphasia, made it unlikely that he remained capable of orchestrating complex criminal schemes) (parenthetical by the Court in *Ortega*).

In *United States v. Minicone*, 521 F.Supp.3d 163 (2021), the Court observed that the defendant's "ill health and advanced age, when viewed in light of his spotless disciplinary record, all indicate that his release into the community will not pose a danger to anyone." *Id.*, at 169.[43]  *See also United States v. Rodriguez*, 492 F.Supp.3d 306, 315 (2020) ("[i]f [defendant's] sentence is reduced to 30 years, he will be more than 60 years of age upon his release, making the likelihood of re-offending even more remote");  *United States v. Monteleone*, 2023 WL 2857559, at *5 ("given Mr. Monteleone's advanced age and health condition, further incarceration is surely not needed to protect the public from further crimes – indeed, the government does not argue as much").

In *United States v. Piggott*, in granting a §3582 motion by a 67-year old defendant with "a previous history of violent crimes" who during the 1990's had been "a leader of a nationwide drug trafficking and money laundering conspiracy[,]" and was convicted after trial, 2022 WL 118632, at *1, 3, the Court noted that "[i]t is also well-established that recidivism decreases significantly with age." *Id.*, at *3.  Consequently, the Court added, "the defendant's "advanced age and declining health mean his likelihood of recidivating is low." *Id*.

---

[43]  Mr. Madonna has maintained a spotless disciplinary record not only during his current period of incarceration, but also during previous prison terms.  In fact, as the PSR notes at ¶ 89, Mr. Madonna provided the Probation Officer with diplomas from "Park College in Parkville, Missouri, which reflected that he was awarded the following:  an associate of science degree in management in 1991;  an associate of science degree in management/accounting in 1993; and a bachelor of science degree in management, also in 1993. Madonna's diploma for the bachelor of science degree included the notation that he graduated summa cum laude." Mr. Madonna eared all three degrees while incarcerated in BOP facilities.

Likewise, in *United States v. Fisher*, 493 F. Supp.3d 231 (S.D.N.Y. 2020), the Court determined that the defendant's "age and time removed from criminal activity, along with his clean disciplinary record, lessen the need for further specific deterrence or to "protect the public from further crimes of the defendant." *Id*., at 238, *citing* 18 U.S.C. §3553(a)(2)(B)-(C). As a result, the defendant's "age makes the risk of recidivism extremely remote." *Id*., *citing United States v. Rice*, No. 83 CR. 150-3 (LGS), 2020 WL 4505813 (S.D.N.Y. Aug. 5, 2020) at *5 (noting that the "[d]efendant's age make[s] recidivism unlikely").

**C.** **_Granting Mr. Madonna's §3582 Would Not Create an Unwarranted Disparity_**

Nor would granting Mr. Madonna's §3582 motion create an unwarranted disparity inconsistent with the mandate of §3553(a)(6). As a threshold matter, Mr. Madonna's medical condition, coupled with BOP's failure to provide sufficient care, defies the ordinary conceptualization of disparity.

As the Court in *Tagliaferro* reasoned, "to the extent that there is any perceived unwarranted disparity in releasing this Defendant some six months early, that disparity is warranted, in the Court's view, by the danger posed to him by the BOP's apparent inability to control his admittedly astronomical blood pressure." 2024 WL 5077350, at *5. *Cf. United States v. Millan*, No. 91 Cr. 685 (LAP) 2020 WL 1674058 (S.D.N.Y. April 6, 2020) (§3582 motion granted because due to defendant's "exceptional record of rehabilitation[,] continuation of his life sentence constituted an unwarranted sentencing disparity").

Judge Block,, who decided *Russo*, has also written a book describing his sentencing philosophy, and how it has changed over time. An article that appeared in *The New York Times* in advance of the book's publication summarized Judge Block's experience and philosophy:

> sometimes a sentence that made sense when it was imposed can look like a bad fit over time.  Prisoners grow old or get sick.  The laws under which they were sentenced change.  Others who committed the same crimes get starkly different prison terms.  Doubts arise about guilt.  On occasion, everyone agrees that the prisoner has been thoroughly rehabilitated.

Adam Liptak, "Long Prison Terms Deserve a Second Look and 'a Little Humanity,' Judge Argues," *The New York Times* (Sept. 9, 2024), available at https://bit.ly/3zkibLJ.  *See also* Frederic Block, *A Second Chance:  A Federal Judge Decides Who Deserves It* (2024);  *Russo*, 2022 WL 16627450 at 10, (quoting *May v. Shinn*, 37 F. 4th 552, 555 at 562 (9th Cir. 2022) (First Step Act "injects into our legal system a compassionate dimension that indeed, as in these two cases, transcends the strictures of the law and represents the humane thing to do in the interests of justice").

Here, it is respectfully submitted that the §3553(a) factors, to the extent applicable considering Mr. Madonna's grave medical circumstances, should not be a barrier to granting his §3582 motion.

93

**Conclusion**

Accordingly, for all the reasons set forth above, it is respectfully submitted that the Court should grant Mr. Madonna's motion for modification of sentence pursuant to §3582(c)(1)(A).

Dated: 6 June 2025
     New York, New York

                              Respectfully submitted,

                              Joshua L. Dratel, Esq.
                              Dratel & Lewis
                              29 Broadway, Suite 1412
                              New York, New York 10006
                              (212) 732-8805
                              jdratel@dratellewis.com

                              Andrew G. Patel, Esq.
                              15 Chester Avenue
                              White Plains, New York 10601
                              apatel@apatellaw.com
                              (212) 349-0230

                              *Counsel for Defendant Matthew Madonna*